```
1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   PRESTON BENNETT,          )
    individually and for a    )
4   class,                    )
                              )
5                 Plaintiff,  )
                              )
6           vs.               )   No. 18 C 4268
                              )
7   THOMAS DART, Sheriff of   )
    Cook County, et al.,      )
8                             )
                  Defendants. )
9
```

10          The deposition of PRESTON BENNETT, taken

11   pursuant to the Federal Rules of Civil Procedure,

12   before Nick D. Bowen, Certified Shorthand Reporter

13   No. 084-001661, at Dixon Correctional Center, 2600

14   North Brinton Avenue, Dixon, Illinois, on Thursday,

15   April 11, 2019, commencing at 1:12 p.m. pursuant to

16   notice.

17      APPEARANCES:

18          THOMAS G. MORRISSEY, LTD., by
            MR. PATRICK W. MORRISSEY
19          (10150 South Western Avenue, Rear Suite
             Chicago, Illinois  60643
20           773.233.2900
             patrickmorrissey1920@gmail.com
21            appeared on behalf of the plaintiff;

22

23

24

EXHIBIT 1

Page 2

```
 1    APPEARANCES:  (Cont'd)
 2       JOHNSON & BELL, LTD., by
         MR. ZACHARY A. PESTINE
 3       (33 West Monroe Street, Suite 2700
         Chicago, Illinois  60603-5404
 4       312.373.0770
         pestinez@jbltd.com)
 5       appeared via teleconference on behalf
         of the defendants.
 6
 7
 8              *  *  *  *  *  *  *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2
   Witness:                              Page
 3
      PRESTON BENNETT
 4
         Examination by:
 5
         Mr. Pestine..................   4
 6       Mr. Morrissey................  72
         Mr. Pestine..................  75
 7       Mr. Morrissey................  80
         Mr. Pestine..................  81
 8
 9
10
             E X H I B I T S
11
12  No.  Description          Marked/Referenced
13   1  Control No. 2018 04310.............   26
     2  Control No. 2018 05003.............   30
14   3  Control No. 2018 05252.............   31
     4  Control No. 2018 05004.............   33
15   5  Control No. 2018 05374.............   38
     6  Control No. 2018 06345.............   38
16   7  Control No. 2018 07322.............   39
     8  Control No. 2018 07094.............   41
17   9  Control No. 2018 07095.............   46
    10  Control No. 2018 07556.............   47
18  11  Control No. 2018 08458.............   47
    12  Control No. 2018 08142.............   50
19  13  Control No. 2018 07557.............   51
    14  Control No. 2018 08347.............   52
20  15  Control No. 2018 08459.............   53
    16  Control No. 2018 06957.............   56
21  17  Control No. NC1807130..............   64
    18  Control No. 2018 04310.............   66
22
23           (Exhibits attached/scanned.)
24                 - - -
```

Page 4

```
 1    MR. PESTINE:  This is a deposition taken
 2  pursuant to notice and continued to this day.
 3       My name is Zach Pestine.  I'm
 4  representing the defendants Thomas J. Dart,
 5  Sheriff of Cook County, and Cook County.
 6       Could you please state your name?
 7    MR. BENNETT:  Preston Bennett.
 8    MR. MORRISSEY:  I think -- go ahead.  Yeah,
 9  he's talking to you.
10    MR. BENNETT:  Preston Bennett.
11    MR. PESTINE:  Mr. Bennett, I'm going to ask
12  you a series of questions.  If your answers are yes
13  or no, I ask that you answer them orally instead of
14  shaking your head because it can be difficult for
15  the court reporter to report nods and head shakes.
16  Is that okay?
17    MR. BENNETT:  Yes, sir.
18       (Witness sworn.)
19          PRESTON BENNETT
20  called as a witness herein, having been first duly
21  sworn, was examined and testified as follows:
22          EXAMINATION
23  BY MR. PESTINE:
24    Q.   Thank you, Mr. Bennett.
```

Page 5

```
 1       Continuing.  If you don't understand
 2  a question, you may ask me to rephrase the question.
 3  But if you answer the question, I will assume that
 4  you do understand.  Is that okay?
 5    A.   Yes, sir.
 6    Q.   All right.  Mr. Bennett, I'm going
 7  to start with some questions just about your
 8  background.
 9       Could you tell me your furthest
10  level of education?
11    A.   Eleventh grade, but I got my GED.
12    Q.   And -- sorry.  Eleventh grade?
13    A.   Eleventh grade in school, but I went
14  back and got my GED.
15    Q.   Okay.  Where did you go to high school?
16    A.   Center for New Horizons.
17    Q.   Okay.  And where -- where are you from
18  originally?
19    A.   Chicago, Illinois.
20    Q.   From Chicago.
21       You lived in Chicago all your life?
22    A.   No, sir.
23    Q.   Where else have you lived?
24    A.   Out of state.  In Houston, Texas for a
```

EXHIBIT 1

Page 6

1 few months. I've stayed in Michigan for some
2 years; Iron Mountain, Michigan.
3      Q.    Okay.  Do you have family out there?
4      A.    In Iron Mountain, Michigan -- it's
5 complicated.  Sort of.  Like a child that's
6 supposed to be mine is out there.
7      Q.    Okay.  What have you done for work in
8 your life?
9      A.    Most recent I've drove for Uber for
10 about five or six months, I believe.
11            I worked at a telecommunication
12 place, two different places for maybe a month
13 apiece.
14            And I worked at a presort and
15 mailing company before my accident for about a
16 month.
17            Not much work history.
18      Q.    When did you drive for Uber?
19      A.    I'm not sure of the exact dates.  I
20 want to say like the beginning of '17 maybe.
21      Q.    The beginning of 2017.
22            When were you charged with the
23 latest crime that you were convicted of?
24      A.    March 29th -- March 28th of '17 -- was

Page 7

1 that '17?  Was it '17 or '18?
2      MR. MORRISSEY:  I can't answer any questions,
3 Mr. Bennett.  If you don't recall ...
4 BY MR. PESTINE:
5      Q.    It was late March?
6      A.    Yeah, it was March -- this is '19.  So
7 it was '18 then.
8      Q.    Okay.
9      A.    Because I've been locked up for a
10 little bit over a year.
11      Q.    So I -- Mr. Bennett, I understand that
12 you are an amputee.
13      A.    Yes, sir.
14      Q.    Is that your right leg or your left leg?
15      A.    My right leg above the knee.
16      Q.    And what happened that you had to get
17 your leg amputated?
18      A.    Multiple gunshot wounds.
19      Q.    I'm sorry to hear that.
20            When did those occur?
21      A.    August 24th, 1996.
22      Q.    Okay.  So for about -- you said 1996?
23      A.    Yes, sir.
24      Q.    So roughly 23 years ago.

Page 8

1      Q.    So you've been living about roughly
2 23 years with an above-the-knee amputation on your
3 right leg?
4      A.    That's not when I got my leg amputated.
5 That's when I got shot.  I got my leg amputated on
6 September 1st of 1996.  On my birthday.
7      Q.    Okay.  So that's not a great birthday,
8 is it?
9      A.    No, not at all.
10      Q.    So while you were driving for Uber, you
11 were an above-the-knee amputee?
12      A.    Yes, sir.
13      Q.    How do you drive with one leg?
14      A.    With the one I have left.
15      Q.    Generally I know people find it easier
16 with two legs to drive.
17            What special protheses do you have
18 for driving?
19      A.    What special -- handicap plates.
20      Q.    All right.  Have you previously been
21 incarcerated?
22      A.    I didn't hear you.  You blinked out.
23      Q.    Have you previously been incarcerated?
24      A.    Yes.  Before this, prior, yes.

Page 9

1      Q.    When were you incarcerated?
2      A.    Say it again.
3      Q.    When?
4      A.    I'm not sure of the exact dates.  I
5 have paperwork I could look at if you want to know.
6      Q.    Okay.  Do you know how many times
7 you've been incarcerated?
8      A.    More than I like to -- a lot.  Too
9 many.
10      Q.    Do you know exactly how many times?
11      A.    No.
12      Q.    Now, what were you convicted of?
13      A.    I've been convict- -- felony
14 convictions?
15      Q.    Specifically.
16      A.    Drugs.  Theft.
17      Q.    Is there anything that you have been
18 convicted of that involved ambulating?
19      MR. MORRISSEY:  Object to the form of the
20 question.
21            If you understand it, you can
22 answer.
23      THE WITNESS:  I don't know what he's talking
24 about.

EXHIBIT 1

Page 10

1          Can you rephrase the question?
2 BY MR. PESTINE:
3     Q.   Okay.  Sure.
4          Sometimes when people commit crimes,
5 you know, they're in the midst of running or it
6 involves, you know, body movement; it's not simply
7 an Internet crime or something where they're
8 sitting down.
9          What have your crimes involved?
10    A.   Drugs --
11    Q.   Or the convictions at least.
12    A.   Drugs and theft.
13    Q.   Have you ever been convicted of a crime
14 for climbing through a window?
15    A.   No.
16    Q.   When did you arrive in Division 10?
17    A.   I want to say on or around March 29th,
18 March 30th, something like that, of 2017.
19    Q.   Okay.
20    A.   Or '18.
21    Q.   Which tiers were you?
22    A.   4D, 2B, and 2A.
23    Q.   Okay.  Do you remember the dates when
24 you moved tiers?

Page 11

1    A.   Not exactly, but I have them in front
2 of me if you need the exact dates.
3    Q.   Okay.  Were you always using crutches?
4    A.   Yes.
5    Q.   What devices did you use prior to
6 arriving in Division 10?
7    A.   I've used everything from wheelchairs
8 to crutches, walkers, knee braces, ankle braces,
9 elbow sleeves, canes, prosthetics.  I used a bunch
10 of things.
11    Q.   Why did you need elbow sleeves?
12    A.   Because just the wear and tear from the
13 crutches.  Before I started wearing the leg, my
14 elbow be going out.  And I got shot through both
15 elbows also.
16    Q.   Okay.  Is there a reason that you
17 switched off devices?
18    A.   Yes.  When I'm driving, I don't wear
19 the prosthesis as much as when I'm not driving
20 because it's uncomfortable sitting down.  So I'll
21 switch to the crutches.
22          I'll use the cane when I'm using the
23 prosthesis.  And then the sleeves for my ankle,
24 knee, or elbow is just due to pain or swelling.

Page 12

1          The wheelchair's like when I'm just
2 too tired to do anything else.
3     Q.   Okay.
4     A.   Just depending on how my day goes.
5     Q.   And generally what do you use when
6 you're walking around?
7     A.   Either my crutches or my prosthesis.
8 When my prosthesis -- I grew out of it, and I
9 haven't been using it as much as I used to.
10    Q.   Do you go on walks?
11    A.   When I had it, yeah.
12    Q.   So you go on walks with your crutches?
13    A.   I mean, that's the only way I can get
14 around, is on my crutches.
15          What you mean, just like walking for
16 recreation?
17    Q.   Yeah.  Recreation or going places in
18 general.
19    A.   I get from point A to point B on my
20 crutches most of the time.
21    Q.   Okay.  When did you first meet your
22 counsel, Patrick Morrissey and Tom Morrissey?
23    A.   I'm not sure of the exact date.  But it
24 was after my incarceration at Cook County.

Page 13

1    Q.   How did you learn about them?
2    A.   A former client of theirs.
3    Q.   Okay.  Do you generally discuss with
4 other inmates ongoing lawsuits --
5    A.   Say it again.
6    Q.   -- in Cook County Jail?
7    A.   Say it again.
8    Q.   With other inmates in Cook County Jail,
9 do you discuss each other's lawsuits?
10    A.   I don't think so.
11    Q.   Have you ever discussed --
12    A.   We might --
13    Q.   -- any lawsuit --
14    A.   I have never had --
15    Q.   -- with any other inmate in Cook County
16 Jail?
17    A.   I've never had a lawsuit.  This is my
18 only one.
19    Q.   You've never had a lawsuit.
20          Have you ever heard about other
21 lawsuits in Cook County Jail?
22    A.   I suppose.  Not in depth.
23    Q.   Well, which lawsuits?
24    A.   Say it again.

EXHIBIT 1

Page 14

1    Q.   Which ones?

2    A.   Not in depth.  Just the fact that they
3 might have one pending.

4    Q.   Okay.  About any specific topic?

5    A.   A lot of people don't like how they're
6 being cared for in the custody of Cook County.  So
7 that might be the broader topic.

8    Q.   And so you will discuss with people
9 their lawsuits, but do you know anything
10 specifically?

11    A.   No, it's not being discussed.  It's
12 just like might come around or -- like not being
13 discussed in depth.  Like they might say that they
14 have a lawsuit or something like that.  But other
15 than that, no further than -- no information being
16 passed.

17    Q.   Okay.  Have you spoken to inmates in
18 Division 10 about grab bars in the cells?

19    A.   Yeah.

20    Q.   What have you said with those inmates?

21    A.   That they should have them.

22    Q.   Okay.

23    A.   That we -- that we basically --

24    Q.   What kind of inmates do you speak to in

Page 15

1 terms of these physical injuries?

2    MR. MORRISSEY:  I don't think Mr. Bennett
3 finished his answer.  We should have some time
4 between each other speaking because there seems to
5 be a bit of a delay.

6        So were you finished answering the
7 question?

8    THE WITNESS:  Yeah.  As far as like what
9 would we talk about as far as like the lack of grab
10 bars and we not supposed to be housed where we're
11 at because it was people in worser condition than I
12 was in; like people with fresh breaks or wounds or
13 stuff like that that was in -- housed over there
14 with me.  And we'll be like, This is not for us
15 over here.  We supposed to be in RTU.

16 BY MR. PESTINE:

17    Q.   When you say "we're not supposed to be
18 here," how do you know that you're not supposed to
19 be there?

20    A.   Because nothing is accessible for our
21 disabilities.

22    Q.   So when you use the bathroom in your
23 cell, how do you use the bathroom?

24    A.   I usually use my crutches to lower

Page 16

1 myself.  And use the wall and my crutches to --
2 or whatever is closest to the toilet depending on
3 which toilet I'm at to raise myself.  And if I'm
4 out in the dayroom, I will have to use the wall or
5 the toilet next to me to raise myself.  But I use
6 my crutches to lower myself.

7    Q.   Okay.  So the crutches serve as an
8 unofficial grab bar?

9    MR. MORRISSEY:  Well, object to the form of
10 the question.

11        You can answer.

12    THE WITNESS:  That's all I have to use, so
13 that's what I use.

14 BY MR. PESTINE:

15    Q.   And in terms of showering in Division
16 10, how -- what was the process like for you
17 showering there?

18    A.   From start to finish?

19    Q.   Well, in Division 10, yeah.

20    A.   I would go ask the officer was the
21 chair there.  If the chair wasn't there, I'll ask
22 him can he go get the chair for me.  He will slide
23 the chair into the dayroom.  I will put my crutches
24 on the wall and grab hold of the chair and scoot on

Page 17

1 it as if it was a skateboard or a scooter into the
2 shower area.

3    A.   I would then turn around and sit on
4 it, wash up what I could, stand up, hold on to it,
5 finish washing up, rinse off, and repeat the
6 process in reverse to get the chair back to the
7 officer.

8    Q.   So the officers would give you the
9 shower chair to shower, and that's how you would
10 shower?

11    A.   The officers would give me the shower
12 chair when I asked for it, yes.

13    Q.   What was the process like for toileting
14 before you were in Cook County Jail?

15    A.   Before I was in Cook County Jail?

16    Q.   Yeah.

17    A.   I had grab bars at two locations that I
18 frequent the most, and that's basically where I be.
19 But if I don't -- if I'm not at those two places,
20 I would get help if I needed help.  But normally I
21 would get up like how I get up at the Cook County,
22 with the wall and with my crutches.

23    Q.   What were those two places?

24    A.   My home before I was -- before I moved,

EXHIBIT 1

Page 18

1 and a girlfriend's house of mine where I was
2 currently moving to.
3     Q.   Okay.  But everywhere else, you would --
4 sorry.  I interrupted you.  I apologize.  Can you
5 continue?
6     A.   At my home that I had and at my
7 girlfriend's home.  And that was basically like the
8 main two places that I would be.  But if I did go
9 somewhere else that -- like someone's home, yeah,
10 that's how I would do it, with my crutches and
11 whatever closest to the toilet.
12     Q.   And for showering, could you describe
13 the process of showering prior to being in Cook
14 County Jail?
15     A.   I go into the bathroom with my
16 crutches, sit down on the bench, and put my other
17 foot into the tub and wash up standing up -- I
18 mean, wash up sitting down.  Then I stand up
19 holding on to the bar and finish washing up and
20 repeat the -- rinse off, repeat the process in
21 reverse.
22     Q.   Could you describe the shower chairs
23 that you were given at Cook County Jail?
24     A.   They was all like PVC tubing with a

Page 19

1 toilet seat on the bottom for like a seat; it looks
2 like a toilet seat.  It had a blue netting for the
3 back.  It had a small -- I believe -- I'm not sure,
4 but I believe they was retractable like a foot
5 stand.  And they had small wheels on it.
6     Q.   Were there armrests?
7     A.   Yes, there was armrests also.
8     Q.   Okay.  And you could hold on to those
9 armrests?
10     A.   I wouldn't hold on to the armrests
11 because they was a little too low.  I will hold on
12 to the back of the chair where the blue netting
13 was.  But the armrests and the back of the chair
14 was like the same PVC piping.
15     Q.   Did you ever speak to officers in
16 Division 10 about toileting?
17     A.   I can't say I recall.
18     Q.   Okay.  When you spoke to officers
19 in Division 10 about showering, what would you
20 generally say?
21     A.   Can I have the shower chair?
22     Q.   Okay.  Did you ever speak to an officer
23 about a fixed bench?
24     A.   To my knowledge, that's not nothing

Page 20

1 that the officers could even help me with, so I
2 don't believe I wasted my time with it.
3         I spoke to the ADA officer, with the
4 superintendent and told -- but other than that,
5 those people that I spoke to, the people that
6 can make things happen, and still nothing happened.
7         But the officers on the --
8     Q.   What did you say to -- what did you say
9 to the other officers -- or to the officers about
10 the fixed benches?  To the compliance officer and
11 the other officer you said you spoke to.
12     MR. MORRISSEY:  Objection.  I think that
13 mischaracterizes his testimony.
14         You can testify.
15     THE WITNESS:  Okay.  I never talked to the --
16 I don't believe that I talked to the officers on
17 the wing about fixed benches or showers or toilets.
18 But I talked to the ADA compliance officer about
19 being moved to RTU to have more handicap-accessible
20 showers, toilets, and things to that nature.
21 BY MR. PESTINE:
22     Q.   Is that compliance officer Sabrina
23 Rivero-Canchola?
24     A.   I don't know her last name.  But

Page 21

1 Sabrina is the first name, yes.
2     Q.   What did you say to her in regards to
3 the shower chairs and fixed benches?
4     A.   I didn't describe just individual
5 problems.  I described overall problems being I'm
6 not -- I'm having a hard time with basically
7 everything as far as showers, toileting.  I didn't
8 specifically say those things, but I talked about
9 as far as housing, period.  And everything that's
10 included with housing I explained to her over and
11 over.
12     Q.   So you had said that there were housing
13 problems in general, but you didn't specifically
14 say that the, you know, the grab bars in the cell
15 or the fixed benches or the grab bars in the shower
16 or the lack thereof was a problem?
17     MR. MORRISSEY:  I object to the extent it
18 mischaracterizes his testimony.
19         You can answer.
20     THE WITNESS:  I'm pretty sure I said
21 something about the showers and the toilets, but
22 for the most part it was housing in general.
23 BY MR. PESTINE:
24     Q.   Did you ever file a grievance about the

EXHIBIT 1

Page 22

1  grab bars or fixed benches in Division 10?
2      A.   I filed a bunch of grievances in
3  Division 10, and all of them are surrounded by
4  housing.  I have a stack here.  I could look
5  through them to see specifically.  But everything
6  still revolved around housing, period.
7              Nothing in Division 10 was
8  accessible to me.  So my housing conditions was not
9  being characterized for my handicap.  So I was just
10  generally speaking on the housing completely to be
11  moved to a more handicap-accessible environment,
12  which is RTU, and I was denied on every account.
13     Q.   Did any officer tell you why you
14  weren't being moved to RTU?
15     A.   No.  But every officer that seen me
16  always said, Why are you here?  Why you not in RTU?
17  Every -- like at least out of ten officers, six
18  officers would ask me that.  Just random officers
19  seeing me walking through the thing going to yoga
20  or going wherever we was going, they would ask me
21  why am I there in Division 10.  The officers would
22  ask me that.
23              Like everybody knew I should be in
24  RTU, but nobody will move me.  They kept on saying

Page 23

1  that it was Classification, couldn't nobody move
2  me.  That's what Sabrina also told me.  That's
3  what --
4      Q.   I'd like to talk with you -- go ahead.
5      A.   That's also what medical told me.
6      Q.   I'd like to speak with you a little bit
7  about a claim in your case regarding the Leighton
8  ramp.
9              Do you understand that claim?
10     A.   Yes.
11     Q.   Can you describe the nature of that
12  claim?
13     A.   It's just pain and discomfort after
14  coming from court, coming from up and down that
15  ramp.
16     Q.   Were you able to -- so you were able to
17  use the ramp --
18     A.   I was on crutches.
19     Q.   -- with your crutches?
20     A.   I was on crutches.  And that was the
21  only way I could get there, so I had to use the
22  ramp.  You don't have many options with Cook County
23  sheriffs.
24     Q.   Did you ever ask for an accommodation

Page 24

1  or any assistance getting up the ramp?
2      A.   Many a times.  And I was never afforded
3  one until I contacted Mr. Morrissey.
4      Q.   Did you ever file a grievance about
5  this?
6      A.   I'm not sure.  Again, I have my
7  grievances right here.  I can look.  I filed
8  a lot of grievances.
9      Q.   So when you say you asked for an
10  accommodation, what did you ask for?
11     A.   From Division 10 to go to court, it's
12  about a mile long in a tunnel.  So I was asking for
13  a wheelchair for long distance.  They hadn't gave
14  me that.
15              So they would make me walk that
16  ramp -- I mean, that long walk to go to court.  To
17  go to Cermak, to go anywhere that was outside of
18  Division 10, I had to take this mile long or
19  however long it is tunnel walk just before we even
20  get to where we're going.  And I asked for
21  accommodations for that, yes.  And I never was
22  afforded one until I contacted Mr. Morrissey.
23     Q.   What did you ask for -- strike that.
24              Did any officer ever tell you that

Page 25

1  they would not give you an accommodation going up
2  the Leighton ramp?
3      A.   No.  But no officer ever asked me if
4  I needed help to go up the Leighton ramp either
5  until I did get the long-distance wheelchair
6  permit.  And then the officers will push me up the
7  ramp.  But until that point, nobody asked and
8  nobody said anything.  There was no signs up.
9  There was no nothing.
10     Q.   Where are you located now?
11     A.   In Dixon Correctional Center.
12     Q.   And when -- were you transferred to
13  Dixon?
14     A.   Yes, from Stateville NRC to Stateville
H House to Dixon Correctional Center.
16     Q.   Do you know roughly the timeline of
17  that?
18     A.   July 20-something I was moved to
19  Stateville NRC.  I was in NRC for about three
20  weeks.  And then I was moved to H House.  I think I
21  was in H House for about ten days.  And then I've
22  been in Dixon ever since.
23     Q.   We've spoken a little bit about your
24  grievances.  So I'd like to go through them with

EXHIBIT 1

Page 26

1  you one by one.  So this is a list of the
2  grievances that you filed when you were in
3  Division 10 of Cook County Jail.
4      A.   Can I go through them with you?
5      Q.   Yes, absolutely.
6           Do you see what's been marked as
7  Exhibit 1 to this deposition?
8           (Brief pause.)
9      THE WITNESS:  Okay.
10 BY MR. PESTINE:
11     Q.   Okay.  So I'd like to go through them
12 with you one by one.  So Exhibit 1 is Control
13 No. 2018 04310.
14     MR. MORRISSEY:  Just for the record, are
15 these -- there's no Bates stamp on these.  And the
16 only ones that have been produced by your office
17 are Bates stamped.  So I'm a bit concerned --
18 confused about which documents we're addressing
19 here.
20     MR. PESTINE:  These are Mr. Bennett's
21 grievances.
22     MR. MORRISSEY:  But the grievances that the
23 sheriff's office has given me are different.  They
24 were marked by the state's attorney's office.  So I

Page 27

1  don't know if these are the entire grievances or
2  not because they're not identified.  And I -- the
3  ones I have are state's attorney's.  The state's
4  attorney marked them, and the ones that you have
5  for the deposition don't have any markings.  So I
6  just don't know where these are from.
7      MR. PESTINE:  Sure.  Would you like to take a
8  short break?
9      MR. MORRISSEY:  I don't think we -- I'm not
10 at my office.  I don't think -- I don't have access
11 to my file.  We don't need a short break.  I just --
12 I'm making a comment that I don't know if these are
13 the grievances that have been produced in this
14 case.
15     MR. PESTINE:  Okay.  Would you like to speak
16 off the record?
17     MR. MORRISSEY:  I mean, I don't think we
18 need to.  I'm just -- these aren't what has been
19 given --
20     MR. PESTINE:  This is a full -- Pat, this is
21 a full list of grievances.  I can tell you that in
22 ours none of those were Bates stamped in this case,
23 none of those exhibits.
24     MR. MORRISSEY:  I don't think --

Page 28

1      MR. PESTINE:  You can go and crosscheck
2  afterwards to determine if this is the full list.
3      MR. MORRISSEY:  Well, I mean, your office
4  never even gave me these.  These -- I don't even
5  know where these came from.  So I just don't know
6  whether the documents your office has have even
7  been produced in this case.
8           The documents that have been
9  produced are Bennett 304 over to Bennett 352.
10 But we can -- why don't we continue
11 on?  So I'm just clarifying that I'm not at the
12 office.  I'm at a correctional facility.  I'm not
13 certain whether these are all the grievances that
14 have been produced in the case.  So you can go
15 ahead.
16     MR. PESTINE:  Okay.  Well, we can continue
17 on, and you can crosscheck that afterward.  Okay?
18     MR. MORRISSEY:  Well, I'm not agreeing to
19 anything.  I'm just saying that I can't -- you
20 know, I can't guarantee these are all his
21 grievances because I --
22     MR. PESTINE:  Okay.
23     MR. MORRISSEY:  -- don't think they've been
24 produced in this case, these ones you've marked as

Page 29

1  an exhibit.
2      MR. PESTINE:  Well, you will have to look at
3  that afterward then.
4  BY MR. PESTINE:
5      Q.   But continuing on to Exhibit 1, control
6  number of which is 2018 04310.
7           Mr. Bennett, can you take a minute
8  to look at that?
9      A.   (Reviewing exhibit.)
10          I'm okay.
11     Q.   You're okay?
12     A.   Yeah.
13     Q.   Now, this is a grievance about -- it's
14 not relevant to any claim in this case, is it?
15     A.   This is a grievance about when I went
16 to court when I first got at Division -- this is
17 basically the first step to me being moved from 4D
18 to 2B -- to 2A.  Which one was I at --
19     Q.   Does this have anything to do with an
20 ADA claim?
21     A.   With what?
22     Q.   With an ADA claim.
23     A.   Not anything besides I was being housed
24 on 4D.

EXHIBIT 1

Page 30

1    Q.  Okay.
2    A.  They had the same shower and toilet
3 structures.  That's about it.  But, no, this was
4 for something totally different.
5    Q.  I'd like to move to Exhibit No. 2,
6 which is Control No. 2018 05003.
7        Can you take a second to look that
8 over?
9    A.  (Reviewing exhibit.)
10        Okay.
11    Q.  And it says, "It's been over twelve
12 days with no order or response to medication and
13 accessories dealing with my visit with physician
14 assistant Ms. Davis."
15    A.  Um-hmm.
16    Q.  Mr. Bennett, is this relevant to an ADA
17 claim in this case?
18    MR. MORRISSEY:  I object to the extent you're
19 asking him to call for a legal conclusion.
20        But you can answer.
21    THE WITNESS:  I'm not sure.
22 BY MR. PESTINE:
23    Q.  What do you think this is about, this
24 grievance?

Page 31

1    A.  This is about the lack of them giving
2 me the medication and accessories that I was asking
3 for that they prescribed for me, the lack of.  I
4 mean, it's self-explanatory what it's about.
5    Q.  Okay.  Do you detail any medication or
6 accessories?
7    A.  Do I know right now the details of the
8 medication or accessories?  I believe --
9    Q.  Yeah.
10    A.  -- in this one it was about -- I think
11 it was some lotion that I was needing on here.  But
12 I'm not sure.
13    Q.  Okay.  I'd like to move to Exhibit 3,
14 which is Control No. 2018 05252.
15        Can you take a second to look at
16 this grievance?
17    A.  (Reviewing exhibit.)
18        I get it.
19    Q.  Can you tell me what this grievance is
20 about?
21    A.  Me trying to get in contact with the
22 ADA compliance officer to tell her about my housing
23 needs and what could she do to get me moved to RTU.
24 And, again, it fell on deaf ears.

Page 32

1    Q.  Okay.  Now, in this grievance, do you
2 discuss anything that is relevant to any of your
3 claims in this case?
4    MR. MORRISSEY:  I object to the extent you're
5 asking him for a conclusion about what's relevant
6 in this case.
7        You can answer.
8    THE WITNESS:  Can you repeat the question?
9 BY MR. PESTINE:
10    Q.  Sure.
11        Mr. Bennett, in this grievance, do
12 you mention a lack of grab bars anywhere?
13    A.  No.  I was just trying to get an
14 interview with the compliance officer because that
15 was the only one that I felt that can help me
16 because she's the person that's supposed to help me
17 because I'm a person with a disability.
18    Q.  Okay.  In the grievance, did you
19 specifically mention problems with a fixed bench
20 or a shower chair?
21    A.  No.
22    Q.  Okay.
23    A.  The only problem was me trying to get
24 in contact with the ADA officer on my own, and I

Page 33

1 couldn't.
2    Q.  Okay.
3    A.  And that was from 4/18 to 5/5.
4    Q.  Turning to Exhibit 4.  Exhibit 4 is a
5 document marked Control No. 2018 05004.
6        Can you take a second to look that
7 over?
8    A.  (Reviewing exhibit.)
9        Okay.
10    Q.  So in this grievance, you say, "I have
11 a disability.  I am not being housed correctly
12 according to ADA standards for the type of
13 disability I have."
14    A.  Correct.
15    Q.  And then in the response by the
16 handling personnel, which it looks here to be
17 Ms. Sabrina Rivero-Canchola, the ADA compliance
18 officer, she says, "I spoke with Mr. Bennett on
19 5/11/18.  His only complaint was shoulder pain and
20 difficulty walking long distances on crutches.
21 Both have been addressed by medical.  Mr. Bennett
22 stated he has no difficulty eating, showering,
23 toileting, or ambulating on the tier."
24    A.  Yeah.  I don't recall saying none of

EXHIBIT 1

Page 34

1 the last part. And my response to that grievance,
2 I wrote, "I was never advised of my ADA housing
3 rights."
4    Q.   So now you're saying that you don't
5 remember saying any of the last part, but --
6    A.   No. I'm saying that I didn't say it.
7 I'm saying that I did not say it.
8    Q.   How come you didn't say that in your
9 appeal?
10    A.   I'm not sure.
11    Q.   So your appeal says, "I was never
12 advised of my ADA housing rights."
13    A.   Right.
14    Q.   Before you went to Cook County Jail,
15 did you know about your ADA housing rights?
16    A.   No, but -- not fully. But I also know
17 that when I go into restaurants, they have grab
18 bars by the toilet so I can get up quicker and fit
19 with more stability. I know when I go to hotels, they
20 got grab bars in the hotel so I can get out the
21 tub.
22         So like I know there are certain
23 accommodations that I need that's not there. I
24 know if it's not there, the lack thereof.

Page 35

1    Q.   Mr. Bennett, does every restaurant that
2 you go to have grab bars in the bathroom?
3    A.   Probably not. But most of them does.
4    Q.   Does every hotel you go to? Sorry. Go
5 ahead.
6    MR. MORRISSEY: What question are we on here?
7 I think ...
8 BY MR. PESTINE:
9    Q.   Does every restaurant that you go to
10 have grab bars in the bathroom?
11    MR. MORRISSEY: Objection; asked and
12 answered.
13         You can answer again.
14    THE WITNESS: Every location does not have
15 grab bars. Every location doesn't, but most of
16 them do. And when you don't see grab bars, you
17 notice it. So you know that your accommodations
18 are not being met.
19 BY MR. PESTINE:
20    Q.   Does every hotel that you go to have
21 grab bars in the bathroom?
22    A.   No. But most of them do.
23    Q.   So when you go to these restaurants or
24 these hotels when you go to the bathroom, how do

Page 36

1 you toilet or even shower?
2    A.   I will go to the bathroom, like I would
3 tell you on the other ones, with my crutches, or if
4 I got on my prothesis, with my prosthesis. I will
5 use my crutches. If I'm using my crutches and the
6 grab bar to get down, I will use my grab bar and
7 the crutches to get up.
8         If I'm using my prosthesis, I'll use
9 the grab bar to get down, I'll use the grab bar to
10 get up.
11         In the shower, I can't wear my
12 prosthesis to the shower, so I'm always going to
13 either be on a walker or crutches, and I'm going
14 to use the grab bar to help me into the tub and
15 maneuver, turn around, and things to that nature.
16    Q.   And so this process is something that
17 you're familiar with doing since 1996?
18    MR. MORRISSEY: Objection to form of the
19 question.
20         You can answer.
21    THE WITNESS: Can you rephrase the question?
22 BY MR. PESTINE:
23    Q.   Sure.
24         You had your leg amputated in 1996,

Page 37

1 correct?
2    A.   Yes.
3    Q.   I would assume that from 1996 onward
4 that most bathrooms that you encountered do not
5 have grab bars.
6    A.   I would say a lot of them don't, but
7 not most.
8    Q.   So you're familiar with the process of
9 if it doesn't have a grab bar even on the things
10 that you do in order to use the toilet?
11    A.   I have to make do of what I have at the
12 moment.
13    Q.   Okay. I'd like to stay on Exhibit 4
14 for a minute with the response by Ms. Rivero-
15 Canchola.
16         What did you speak to Ms. Rivero-
17 Canchola about?
18    A.   About being moved. About the long
19 walks, the wheelchair for long walks. That's what
20 I talked to her about. Yet, nothing about my move
21 is in here.
22    Q.   So you didn't speak to her about
23 showering or toileting?
24    A.   I spoke to her about my shoulder. I

EXHIBIT 1

Page 38

1 spoke to her about the long walks. I spoke to her
2 about housing in general. Housing consists of the
3 shower and the toilets.
4    Q.   But you never specifically mentioned --
5    A.   No.
6    Q.   -- the showers and toilets?
7    A.   I mentioned my accommodations.
8    Q.   Okay. I'd like to turn to Exhibit 5,
9 which is Control No. 2018 05374.
10        Can you take a minute to read this?
11   A.   (Reviewing exhibit.)
12        Yeah.
13   Q.   So this grievance, according to you, it
14 sounds like this was an unhappy encounter with some
15 of the officers.
16   A.   Correct.
17   Q.   Does this -- is this related to grab
18 bars or shower chairs?
19   A.   No.
20   Q.   Okay. Is it related to wheelchairs or
21 accommodations at the Leighton ramp?
22   A.   No.
23   Q.   Okay. I'd like to turn to Exhibit 6,
24 which is Control No. 2018 06345.

Page 39

1        Can you take a second to read that?
2    A.   (Reviewing exhibit.)
3        Yeah.
4    Q.   Now, does this grievance, Mr. Bennett,
5 relate to grab bars, fixed benches, or the Leighton
6 ramp?
7    A.   No.
8    Q.   Okay. I'd like to turn to Exhibit 7,
9 which is Control No. 2018 07322.
10        Can you take a second to read that?
11   A.   (Reviewing exhibit.)
12   Q.   Have you read it?
13   A.   Yes.
14   Q.   Now, is it fair to say here where you
15 note, "The only thing I'm grieving is a lack of
16 report written. All other issues have been
17 addressed," that this grievance is only about a
18 lack of a prior report?
19   MR. MORRISSEY: Objection. That
20 mischaracterizes. The grievance speaks for itself.
21        You can answer.
22   THE WITNESS: The grievance was -- okay.
23 Cook County, if you grieve about two different
24 things in one grievance, they'll send it back

Page 40

1 to you and say that you need to separate the
2 grievance. So this basically is a copy of a
3 different grievance that you're about to come up
4 to, and this was just the lack of an incident
5 report being written about the same issue.
6 BY MR. PESTINE:
7    Q.   Okay. So this grievance specifically
8 does not relate to grab bars, fixed benches, or the
9 Leighton ramp?
10   A.   Yes, it does.
11   Q.   How so?
12   A.   The lack of the incident written on the
13 fall in the shower.
14   Q.   Where does it say that?
15   A.   "On the date above -- on the date of
16 incident above, I was hurt due to broken equipment.
17 C/O Paladin was informed and neglected to write an
18 incident report."
19   Q.   So where does it say what the broken
20 equipment was?
21   A.   On the other grievance. Like I said,
22 this was --
23   Q.   Okay.
24   A.   Yeah.

Page 41

1    Q.   And we'll get there. We'll actually
2 get there shortly if that is a late grievance. But
3 this grievance specifically does not specifically
4 mention shower chairs, fixed benches, grab bars, or
5 the Leighton ramp?
6    A.   Not physically, no, but it pertains to
7 it.
8    Q.   Okay.
9    A.   Because the incident that I'm -- the
10 incident that was a lack of being reported was
11 about a fall due to lack of grab bars, broken
12 shower chairs, and things to that nature. So how
13 wouldn't it be a part of it just because I didn't
14 write it in there? And I got another grievance
15 probably from the same date.
16   Q.   Sure. There was a -- I understand that
17 you said that there was a broken shower chair.
18   A.   Right.
19   Q.   Correct?
20   A.   Right.
21   Q.   Okay. So I'd like to turn to Exhibit
22 8, which is Control No. 2018 07094.
23   A.   Okay.
24   Q.   Can you take a second to read that?

EXHIBIT 1

Page 42

1    A.    (Reviewing exhibit.)

2         Yes.

3    Q.    And your grievance states, "I have put

4  in requests and work orders for this chair that was

5  given to me to shower to be fixed or replaced, SN

6  No. 1000248693.  It hasn't."

7         And the response from -- it says

8  Sabrina Canchola, says, "Shower chair has been

9  replaced.  Chair was not usable.  For future

10 concerns regarding shower chairs, please request to

11 see ADA compliance officer through your CRW."

12   A.    She wrote "chair was not unusable."

13   Q.    Correct, "chair was not unusable."

14        So I'll read that again.  Sabrina

15 says, "Shower chair has been replaced.  Chair was

16 not unusable.  For future concerns regarding shower

17 chairs, please request to see ADA compliance

18 officer through your CRW."

19        And you respond, "The chair was

20 broken.  If -- you say "I," but I think you mean

21 "it" -- if it was usable," again, I think you mean

22 "it" -- would not have been replaced."

23   A.    Correct.

24   Q.    Correct?

Page 43

1    A.    Yes.

2    Q.    So in this particular grievance, you're

3  grieving that there was a shower chair that was

4  broken?

5    A.    Yes.

6    Q.    And you got a new shower chair?

7    A.    By the time the -- by the time the

8  response came back, they had took the shower chair

9  out.

10        Another thing that I didn't know

11 at the time that it was two shower chairs on the

12 floor.  And I would complain about the shower chair

13 once, and when it came back, I thought it was

14 fixed.  But it was just that it wasn't the one that

15 was broken brought back.  So like the same one that

16 go out might not be the same one that come back.

17        So at first I thought it was fixed,

18 but it wasn't.  It was just a different chair.

19 When I was putting in requests previous to this

20 grievance.

21   Q.    Is that in a grievance, what you just

22 said?

23   A.    "I have put in requests and work orders

24 for this chair that is given to me to shower to be

Page 44

1  fixed or replaced."  And that's the actual serial

2  number of the chair that was broken.  I had to look

3  at the --

4    Q.    Right.  But eventually, Mr. Bennett,

5  you got a chair that was working?

6    A.    Yeah.  They got rid of that chair.

7  They threw it out.

8    Q.    Yeah.  And then you got a new chair.

9  So in this --

10   A.    They threw the chair out after my fall.

11   Q.    Okay.  In this particular grievance,

12 you're not claiming that the shower chair in

13 general or the new shower chair is insufficient;

14 you're saying that you had a problem with the old

15 shower chair because it was broken?

16   A.    Okay.  Again, the way Cook County

17 operates, if you speak on more than one issue

18 inside a grievance, they will send it back and tell

19 you that your grievance is no good because you're

20 speaking on more than one issue.  That's why

21 Exhibit 7, 8, and 9 all have the same date on it.

22 Because they was basically the same grievance that

23 I broke up to let all my issues be heard.  That's

24 why I was telling you the grievance with Exhibit

Page 45

1  No. 7 on it does apply to the lack of shower chairs

2  and all of that because it was basically I had to

3  break the grievance up to even get it heard, or

4  they would have sent it back to me saying that I'm

5  addressing too many issues.

6    Q.    So grievances 7, 8, and 9 cover a

7  comprehensive review of your issues with the shower

8  chair in Division 10?

9         MR. MORRISSEY:  Objection.  That

10 mischaracterizes what he said.

11        THE WITNESS:  Division --

12        MR. MORRISSEY:  I mean, he's already

13 testified about what the grievances talk about.

14 BY MR. PESTINE:

15   Q.    So what -- so grievances 7, 8, and 9

16 regard issues with the broken handle on a shower

17 chair, correct?

18   A.    Grievances 7, 8, and 9 was written as a

19 result of a broken shower chair and a fall and the

20 lack of an incident report written about my fall.

21 That's why I wrote one for the incident report, one

22 for the shower chair, and one for the fall.

23 Because if I would have put all three of those in

24 one grievance, they would have sent it back to me

EXHIBIT 1

Page 46

1 as non- -- inefficient.

2    Q.   Did you have issues with -- did you

3 have issues with the shower chair other than that

4 it was broken?

5    A.   The fact that it had wheels on it.

6    Q.   Did you put that in the grievance?

7    A.   No.  I mean, we have to use what we

8 have.

9    Q.   Well, Mr. Bennett, you filed a number

10 of grievances.

11    A.   Yeah, I did.

12    Q.   Why wasn't that in a grievance?

13    A.   I didn't think about it, I guess.

14    Q.   Okay.  I'd like to turn to Exhibit 9,

15 which we've discussed a little bit now, but we

16 haven't turned to it yet.  So this is Control No.

17 2018 07095.

18         Can you take a second to read that?

19    A.   (Reviewing exhibit.)

20         Yes.

21    Q.   And so this grievance is about you

22 falling due to the broken handle on a shower chair.

23 And as we've seen from previous grievances, that

24 shower -- and from your testimony that shower chair

Page 47

1 was replaced?

2    A.   After this grievance, yes.

3    Q.   Yes.  Okay.  I'd like to turn to

4 Exhibit 10.  This is marked Control No. 2018 07556.

5         Can you take a second to read that?

6    A.   (Reviewing exhibit.)

7         Okay.

8    Q.   Now, what is this grievance about?

9    A.   Lack of medication being prescribed for

10 pain after my fall.

11    Q.   Okay.  What fall is that?

12    A.   The fall in the shower.

13    Q.   Okay.  So is that the same fall that

14 was discussed in Exhibits 7 through 9?

15    A.   Yes.  The only fall.

16    Q.   Okay.  That was the only fall.

17         I'd like to turn to Exhibit 11.  And

18 that's Control No. 2018 08- -- I believe that's a

19 9, so 08958.

20         Can you take a second to look at

21 that?

22    MR. MORRISSEY:  It's actually a 4.

23 BY MR. PESTINE:

24    Q.   Okay.  Pat, you might be right about

Page 48

1 that.  I'll restate that.

2         This is Exhibit 11, Control No. 2018

3 08458.

4    A.   Okay.

5    Q.   In this grievance, you say, "I'm being

6 held in Division 5 tunnel due to my wheelchair

7 permit for long walks.  This process allows me no

8 time to prep with my state-appointed lawyer at my

9 court dates."  And I think that by this time you

10 were at IDOC based on the response.

11         Now, the date of the response was

12 July 20th, 2018, and it was mailed to you at

13 IDOC -- it says it was received on July 25th, 2018;

14 is that correct?

15    MR. MORRISSEY:  I object to your

16 characterization of it being received.  It's the

17 day where the inmate services says they sent it.

18    MR. PESTINE:  If you look at the line that

19 says Inmate Signature, Mailed to IDOC, and on the

20 next line it says Date Response Was Received is

21 what I'm reading.

22    MR. MORRISSEY:  But that --

23    MR. PESTINE:  That's July 25th, 2018.

24    MR. MORRISSEY:  That would be when inmate

Page 49

1 services would have sent it off, I would assume, to

2 the IDOC because they have a stamp.  And they sent

3 it to him.

4    MR. PESTINE:  Okay.  I believe that in my

5 prior question all I said was the date response was

6 received, which is how it is written here.

7    MR. MORRISSEY:  Well, since neither of us

8 generated this record, I don't think there's any --

9 I don't think Mr. Bennett has any foundation to

10 testify about that unless -- you can ask him a

11 question whether he knows about it.

12 BY MR. PESTINE:

13    Q.   Mr. Bennett, have you seen this

14 response before?

15    A.   This piece of mail?

16    Q.   Yeah.

17    A.   I received this piece of mail at

18 Dixon -- I received this piece of mail at Dixon

19 much later than this date.  I'm not sure of the

20 exact date, though.  But I actually have the actual

21 letters that they came in on my wing, if I could

22 look on there for post dates.

23    Q.   Okay.  And in the response, it says,

24 "In the presence of Mr. Bennett, Mr. Bennett's PD,

EXHIBIT 1

Page 50

1 the state's attorney, and the judge assigned to the
2 case, all were informed that DOC brings detainees
3 up to the courtroom when the parties are ready to
4 call the case.  This has nothing to do with a
5 wheelchair."
6     A.   It has everything to do with a
7 wheelchair.
8     Q.   Mr. -- okay.  I understand that is your
9 testimony.
10          Mr. Bennett, is this grievance about
11 the Leighton ramp?
12     A.   No.
13     Q.   Is this grievance about grab bars or
14 fixed benches?
15     A.   No.
16     Q.   Okay.  I'd like to turn to Exhibit 12.
17 That's Control No. 2018 08142.
18          Can you take a second to read that?
19     A.   (Reviewing exhibit.)
20          Yeah.
21     Q.   And this grievance is about problems
22 that you had at a meal where another inmate said
23 that they noticed -- they found a bug on their
24 dinner tray.

Page 51

1     A.   Um-hmm.
2     Q.   Is that correct?
3     A.   Yes.
4     Q.   Does this grievance relate to grab
5 bars, fixed benches, or the Leighton ramp?
6     A.   No.
7     Q.   I'd like to turn to Exhibit 13.  That
8 is Control No. 2018 07557.
9          Can you take a second to read that?
10     A.   (Reviewing exhibit.)
11          Yeah.
12     Q.   Looks like there's more issues here
13 with mealtime.  And there was something that you
14 believed to be a rock in salad.  Is that correct?
15     A.   Yes, sir.
16     Q.   Do you know if it was a rock?
17     A.   It was a rock.
18     Q.   There was a rock.  Okay.
19          Does this relate to the Leighton
20 ramp?
21     A.   No, sir.
22     Q.   Does it relate to grab bars or fixed
23 benches?
24     A.   No, sir.

Page 52

1     Q.   I'd like to turn to Exhibit 14.  This
2 is Control No. 2018 08347.  It says, "On all of the
3 above dates of incident, the rations of toothpaste
4 had been outdated one and two years of expiration
5 date."
6          Now, it looks like by the time that
7 the response was sent, you were at IDOC.
8          Now, this is not relevant to a claim
9 in this -- what I'm about to say is not relevant to
10 a claim in this case.  But from what I've heard,
11 Mr. Bennett, expiration dates, just to clear up any
12 fears that you might have, toothpaste may lose
13 fluoride after -- what strengthens your teeth --
14 after expiration dates, but it's still safe to use.
15     A.   Okay.
16     Q.   But that's neither here nor there.
17 That's just to clarify any fears.
18          But this grievance in particular
19 that -- and also, don't quote me on that because
20 I'm not a dentist.  That's just what I've heard.
21          But this grievance does not relate
22 to the Leighton ramp?
23     A.   No, sir.
24     Q.   It does not relate to grab bars or

Page 53

1 fixed benches?
2     A.   No, sir.
3     Q.   Okay.  I'd like to move to Exhibit 15.
4 And this is Control No. 2018 08459.
5          Can you take a second to read that?
6     A.   (Reviewing exhibit.)
7          Okay.
8     Q.   And this grievance states, "I tried
9 explaining to Sergeant Plante that the system the
10 ADA has in place with me allows me no time to speak
11 with my lawyer before court.  He told me that he
12 would call and say I refused court and give me
13 another court date if I didn't return to Division 5
14 tunnel disregarding my plea to talk to my lawyer."
15          And the response looks like it's by
16 someone named Lieutenant Alvarez; is that correct?
17     A.   If you say so.
18     Q.   Could be Alvaro.  Sometimes it's hard
19 to read people's signatures.  Mine is as bad as it
20 gets.
21          By this time you were in IDOC as it
22 says Mailed to IDOC; is that correct?
23     A.   Yes.
24     Q.   But the response says, "ADA must remain

EXHIBIT 1

Page 54

1 in bullpen until the judge asks for them to be
2 taken to -- I believe that says "court," but we can
3 go with that because that makes sense.  "If Inmate
4 Preston needed to talk to his lawyer he will have
5 that opportunity to do so before court proceeded."
6        Does this grievance relate to shower
7 chairs or fixed benches?
8    A.  No.
9    Q.  Does it relate to grab bars?
10    A.  No.
11    Q.  Does it relate to Leighton ramp?
12    MR. MORRISSEY:  I object to your -- these
13 questions.  I mean, the grievance speaks for
14 itself.  And, I mean, we can go back to it on my
15 examination, but it's misleading the way you're
16 addressing this -- these questions.
17    MR. PESTINE:  How is it misleading?
18    MR. MORRISSEY:  It's misleading because the
19 reason he's held in that holding cell is because
20 Leighton's not accessible.  There are no grab bars
21 in any of the holding cells.  And the Leighton ramp
22 isn't accessible.  So it's misleading to make these
23 narrow questions to have him say a grievance isn't
24 related to accessibility when, in fact, it totally

Page 55

1 is.  It's the reason why he's held there.  And it's
2 the reason why --
3    MR. PESTINE:  So right now I think you're
4 making some legal conclusions and you're making an
5 argument --
6    MR. MORRISSEY:  Well, Mr. Pestine, you asked
7 me to explain why I think these questions are
8 misleading to you.  And they are.
9    MR. PESTINE:  What is misleading about asking
10 what the grievances that Mr. Bennett filed relate
11 to?
12    MR. MORRISSEY:  Because, number one, the
13 grievances speak for themselves, and you keep
14 narrowly asking about grab bars and the ramp.  The
15 reason why he's being situated in the basement of
16 Division 5 is because there's nothing accessible in
17 Leighton.  And he was having a difficult time
18 crutching up the ramp, and they gave him a
19 wheelchair.  But instead of allowing him to be in
20 the courtroom -- in the bullpen adjacent to the
21 courtroom, they hold him in the basement.  So I
22 think these narrow questions about the grievances
23 are misleading to try and get him to --
24    MR. PESTINE:  I very much disagree with you,

Page 56

1 and I think that right now you, as counsel, are
2 trying to establish facts that don't yet exist in
3 this case.  And you can't establish them by
4 speaking them into a deposition.  But they
5 certainly aren't misleading.
6 BY MR. PESTINE:
7    Q.  I'd like to turn to Exhibit 16.  This
8 is Control No. 2018 06957.
9        Can you take a second to read this,
10 Mr. Bennett?
11    A.  (Reviewing exhibit.)
12    Q.  What is this grievance about?
13    A.  Me trying to get a limb.
14    Q.  Okay.  And CCDOC said that it wasn't
15 something that they could do at the time?
16    A.  They said that there was a lot of red
17 tape and lack of funding even though Dr. McCarthy
18 told me that -- aware of me of how much a limb was
19 needed due to my age and the risk of blowing out my
20 shoulder and my knee or my ankle.
21    Q.  Did you try to get a limb before you
22 were in Cook County Jail?
23    A.  Not exactly.  I still had one.  It was
24 just un- -- I couldn't use it at the time.  And the

Page 57

1 doctor that made it was in Michigan, and I was back
2 and forth from Michigan to Illinois.
3    Q.  Why couldn't you use it?
4    A.  I grew out of it.  You have to stay
5 like within a certain weight range.  And I was
6 going through a lot of stress, and I was losing
7 weight.  And it was just a lot going on in my life.
8 I was homeless at the time before I was arrested.
9 So I was going back and forth from my girlfriend's
10 house in Illinois to a friend's house in Michigan.
11    Q.  So when was the last time that you used
12 the limb?
13    A.  Maybe nine to twelve months before my
14 arrest date.
15    Q.  Did you hear me?
16    A.  Yes.
17    Q.  Okay.  It looks like the screen is
18 frozen or shaking.  Now it's back.
19        My last question was when was the
20 last time you used the limb?
21    A.  I'm going to say from nine months to
22 twelve months before I was arrested.
23    Q.  It cut out a little bit.  Did you say
24 before you were arrested?

EXHIBIT 1

Page 58

1    A.  Yeah.
2    Q.  When was that?
3    A.  March 28th of '18.
4    Q.  Of? Can you repeat that?
5    MR. MORRISSEY:  Why don't we -- you can
6 repeat it.
7    THE WITNESS:  March 28th of '18.
8    MR. MORRISSEY:  All right. I'm going to take
9 a break.
10    MR. PESTINE:  Of 2018.
11    MR. MORRISSEY:  I'm going to take a break.
12 I'm going to use the washroom.
13    MR. PESTINE:  Well -- okay.
14        (Recess taken.)
15 BY MR. PESTINE:
16    Q.  Mr. Bennett, before we took a break, we
17 were speaking about the prosthetic limb that you
18 had.
19        How many different prosthetic limbs
20 have you used?
21    A.  Three. Well, two and a half.
22    Q.  Can you explain?
23    A.  The first leg I had was brand new. The
24 second leg I had was a rebuild from the first leg

Page 59

1 and the second leg. And the third leg was a
2 rebuild from the second leg and the third leg.
3 Does that make sense?
4        Okay. They gave me -- the first leg
5 I got --
6    Q.  I'm not following.
7    A.  The first leg I got was brand new.
8 The second leg I got was partially brand new with
9 pieces used from the leg prior. And the third leg
10 I got was brand new -- partially brand new with
11 pieces from the leg prior.
12    Q.  Okay. So I think you had mentioned
13 before that sometimes you need to reshape the limb
14 based on different things that are happening with
15 your body at the time, losing weight, that kind of
16 thing?
17    A.  Yeah. You got to stay like -- like,
18 say, if you 200 pounds when you get fitted for the
19 limb -- they try to advise you to stay at least 10
20 pounds below or 10 pounds above. Like, say, if you
21 200, they don't want you to go below 190 or above
22 210 because it's going to throw off the fitting of
23 the leg. And I went well below due to stress. So
24 I wasn't able to wear the limb.

Page 60

1    Q.  Okay. So when your weight fluctuates,
2 you need to -- either need a new limb, or you
3 need to --
4    A.  A new fitting.
5    Q.  -- reshape --
6    A.  Yeah, a new fitting.
7    Q.  -- the one you have?
8        A new fit. Okay.
9        When are the dates of each of the --
10 well, let's call them three limbs?
11    A.  Um-hmm. What was the dates?
12    Q.  Yeah. Do you remember the dates that
13 you used them?
14    A.  The days that I used them?
15    Q.  The dates.
16    A.  Like --
17    Q.  The dates as in the years.
18    A.  Oh, from '97 to 2001. And then maybe
19 from -- wait a second.
20        Maybe '97 to 2002. And then from --
21 there was a big gap after that one because I just
22 lost interest in it because it was hurting so much.
23        Then I got a new one, the one that I
24 was telling you about at Marquette, at Marquette in

Page 61

1 Michigan; that was my second one. That was in like
2 '09, I believe. So it was like a nice gap in
3 between them two.
4        And then the next one was like '13
5 or '14.
6    Q.  Okay. So you're saying it was '09 to
7 '13 or '14?
8    A.  No. It was from '97 to 2002 or '03.
9 Then there was a gap. I had the same leg, but I
10 couldn't fit it. And I never tried to get refitted
11 for another one until '09. And I wore that one
12 from --
13    Q.  Okay.
14    A.  -- '09, '10, '11, '12, '13, '14,
15 something like that. Then I got a new one.
16 And that was the one that I recently had.
17    Q.  And you wore that until, I believe you
18 said sometime in 2017?
19    A.  Right.
20    Q.  But you -- so after the one in 2017,
21 you didn't seek to get a new one?
22    A.  No. See, it was a different build on
23 the one in 20- -- the last one I got was different
24 from the first two fittings. It was a whole

EXHIBIT 1

Page 62

1 different setup. So I could use socks to thicken
2 up or to unthicken the fluctuation of my weight.
3 I could use socks to fill up the gap if I lose
4 weight.
5          So it was just the fact that I
6 need -- me needing more socks. But then when I
7 went to go get more socks, they told me that I
8 shouldn't use that many because I had lost so much
9 weight. So I was just trying to get a good time to
10 go get it refitted.
11     Q.   Okay. But you -- and you never found
12 that good time before you went to Cook -- in the
13 year or so before you went to Cook County Jail?
14     A.   Yes. The months before I went to Cook
15 County Jail, yeah.
16     Q.   Yeah. When you were using these
17 prosthetic limbs, what was the process like for
18 showering and toileting?
19     A.   Toileting, basically, like I said,
20 I could get to the toilet by walking using the
21 prosthetic and the cane. And if it had grab bars,
22 I could use the grab bars to sit down. If it
23 didn't have grab bars, I used the cane and the wall
24 to sit down.

Page 63

1          As far as showering, showering is
2 always the same because I can't wear the leg into
3 the shower. So it's -- I'm always either on
4 crutches or my walker when I'm going into the
5 shower. So it's the same process that I already
6 told you about.
7     Q.   So you can shower with a walker?
8     A.   No. I'm saying how I get to the
9 shower.
10     Q.   Okay. Can you shower with a walker?
11     A.   No, I can't shower with a walker. I
12 get to the tub with the walker or get to the shower
13 with the walker --
14     Q.   Okay.
15     A.   -- versus wearing a prosthetic, you
16 know, because I can't get in the tub with the
17 prosthetic. So I use my crutches or the walker to
18 get to the tub and then get into the tub.
19     Q.   I see. Why did you need a cane when
20 you had a prosthetic for toileting?
21     A.   Just for extra balance.
22     Q.   Okay.
23     A.   No, the cane is not for me toileting.
24 The cane is for me to walk around. But, you know,

Page 64

1 I use the support of the cane while sitting down so
2 I don't, you know, flop down.
3     Q.   Is that sort of the same function as
4 the crutch?
5     A.   Right.
6     Q.   Okay. All right. I'd like to turn to
7 Exhibit 17. And this is Control No. -- it says NC
8 or perhaps just C 1807130.
9          Can you take a second to read that?
10     A.   (Reviewing exhibit.)
11          Um-hmm.
12     Q.   And this also discusses difficulty
13 getting a limb. And you say, "It has been 15
14 calendar days with no reply to my grievance about
15 me being fitted for a limb while I'm being detained
16 here at CCDOC, Division 10, tier 2B," correct?
17     A.   Yes.
18     Q.   And so what we saw from the response to
19 the last grievance is that Cook County DOC did not
20 think that it was feasible to fit you for that
21 limb.
22     A.   Yes and no. But this grievance was
23 basically for the simple fact that they have only
24 15 days to reply to my grievance and they didn't.

Page 65

1 But they went back -- like because me and the CRW
2 for Division 10, 2B was discussing this, and she
3 knows that they didn't do it in a timely fashion.
4 And they actually postdated the response to say
5 that they gave it to me on time when she said that
6 it wasn't in her mailbox the day of me writing this
7 grievance. So they attached it --
8     Q.   Could you repeat that? It went out
9 again.
10     A.   Basically --
11     MR. MORRISSEY: Well, do you want to have his
12 answer read back?
13     MR. PESTINE: Yes, please.
14          (The record was read as follows:
15          A. Yes and no. But this
             grievance was basically for the
             simple fact that they have only
16          15 days to reply to my
             grievance and they didn't. But
17          they went back -- like because
             me and the CRW for Division 10,
18          2B was discussing this, and she
             knows that they didn't do it in
19          a timely fashion. And they
             actually postdated the response
20          to say that they gave it to me
             on time when she said that it
21          wasn't in her mailbox the day
             of me writing this grievance.
22          So they attached it --)
23 BY MR. PESTINE:
24     Q.   Okay. So this grievance in Exhibit 17

**EXHIBIT 1**

Page 66

1 doesn't relate to the Leighton ramp or grab bars or
2 a fixed bench?
3     A.   I guess not.
4     MR. MORRISSEY:  I don't want you to guess.
5 BY MR. PESTINE:
6     Q.   I'd like to turn to Exhibit -- were you
7 done?
8     A.   Well, no.
9     Q.   I'd like to turn to Exhibit 18 now.
10 Exhibit 18 here, you'll see is actually just
11 another copy of what was already marked Exhibit 1.
12 And if you have Exhibit 1, you can compare those
13 two.
14     A.   That's the same one.
15     Q.   Is that correct?
16     A.   Yes.
17     Q.   I'd actually like to read this one
18 because I don't believe I read it at the time.  I
19 think I had discussed what it said, but I'd like to
20 actually read it.
21          So it says, "On the above date, I
22 had no cellmate as I prepared for court.  As I
23 returned from court, I did have a cellmate, and he
24 informed me that all my property had been removed

Page 67

1 by another unknown inmate.  Well, I let my wing
2 officer know I wanted charges filed, so could he
3 overlook the tapes to see who it was.  In the end,
4 I was told by all staff, white shirts included, to
5 just take the loss."
6          First, I'm sorry that that happened.
7 It doesn't sound like a good experience.
8          But I'd like to speak to you about
9 all of your grievances generally.
10          So you filed -- there's 17
11 grievances here.  I know it's been a little bit,
12 but can you remember any other grievance that you
13 filed?
14     A.   Outside of these?  No.
15     Q.   So those grievances have to do with
16 having cell- -- everything from having cellmates to
17 not having cellmates, to finding, you know, rocks
18 in your salad or somebody else having a roach in
19 their -- possibly having a roach in their food,
20 to --
21     A.   All of them pertaining to my living
22 conditions.
23     Q.   -- broken shower chair.
24     A.   All of them basically pertain to my

Page 68

1 living conditions.
2          And it wasn't the fact that I had a
3 cellmate or not a cellmate.  It was the fact that
4 all my property was stolen.  I don't care if they
5 put me in a cell with two people, ten people, or no
6 people.
7     Q.   Yeah.
8     A.   It was the fact that my property was
9 stolen.
10     Q.   And, again, I'm sorry someone took your
11 stuff.
12     A.   And they deflected in my grievance and
13 said that inmate spoke to supervisor on the 4th of
14 April 2018 stating that his commissary was missing
15 from his cell.  Preston was asked for his
16 commissary receipt.  He could not -- so he could
17 show that he had bought what was taken.  Preston
18 could not provide proof that he purchased
19 commissary.  Preston was booked on the 29th of
20 March of '18 and was not incarcerated long enough
21 to order commissary and receive it prior to the day
22 that they were saying it basically.  On April 4th,
23 tier B was -- the camera was reviewed.
24          But I let them know in my grievance

Page 69

1 my grievance don't even talk about commissary.  I'm
2 talking about my property, period.  Everything that
3 I owned that was in the cell was taken.  They
4 jumping to commissary when my grievance didn't even
5 speak on commissary, yet they was trying to
6 reflect, because if they would have looked at the
7 tapes, they would have seen somebody going into
8 the -- into my cell taking out my things.  Because
9 the officer just popped my door for another inmate.
10 He got tricked, but -- because he was new, and he
11 didn't want to wait to follow me up, and his peers
12 helped him out.  That's how they work at Cook
13 County.
14     Q.   I'm really sorry that you had stuff
15 taken.  I hope that doesn't happen again.  I know
16 that's not a good thing for anyone.
17          Is it fair to say that when you had
18 issues at Cook County Jail, you knew to file a
19 grievance?
20     A.   Every issue that I had I didn't file a
21 grievance for.  I would speak with the police, and
22 if they didn't do -- depending on what it was, I
23 speak to the police or medical staff, and if they
24 couldn't resolve it, yes, I would file a grievance.

EXHIBIT 1

Page 70

1 That's our only form of being heard.

2    Q.   So you have grievances about all of
3 these things, but there was no grievance about lack
4 of help getting up the Leighton ramp?

5    A.   No, I didn't put in a grievance for
6 that.

7    Q.   And there was no grievance about grab
8 bars in the cells?

9    A.   I just grieved housing.

10    Q.   Okay.  And specifically no grievance
11 about fixed benches or grab bars in the --

12    A.   I didn't specifically --

13    Q.   -- showers?

14    A.   -- grieve anything as far as my living
15 conditions outside of my living conditions.  I
16 generally spoke to it in a whole.  Housing, I
17 figured, would cover all of that.  Because it's
18 housing.  I'm asking did --

19    Q.   Okay.

20    A.   I was asking to be moved to a facility,
21 a building that you have at your disposal for
22 people with handicaps like myself.  And, again, I
23 was refused on every time.

24    Q.   Okay.  And when you did file a

Page 71

1 grievance on the shower chair, it was that the
2 shower chair was broken, but after it was replaced,
3 you didn't file any other grievances on the shower
4 chairs?

5    A.   First I put in -- I asked an officer to
6 put in work orders.  I put in requests to get a new
7 shower chair or the shower chair fixed.

8         It wasn't until I fell on the broken
9 shower chair -- because I thought it was the fixed
10 one.  Because they kept swapping them out, I didn't
11 know it was two chairs.  I only thought it was one.
12 So when I took a shower, I thought that they had
13 fixed it or gave up a new one.  But then that chair
14 left and then another one came, and it was the same
15 broken chair.  And that's the chair that I fell in
16 with the serial number that I grieved.

17         So that's why I grieved that
18 specific chair with the serial number and
19 everything so they can't say, Oh, this wasn't the
20 chair, because I wrote the serial number down off
21 the chair.

22    Q.   So after -- so the chair was replaced?

23    A.   After I grieved it, after I fell, yes.
24 After the --

Page 72

1    Q.   And after it was replaced, you didn't
2 file another grievance about shower chairs or
3 trouble showering?

4    A.   I never filed grievances about
5 showering, period.  I grieved about housing as a
6 whole.

7    MR. PESTINE:  Okay.  I have nothing further.

8    MR. MORRISSEY:  I got a few questions.

9         EXAMINATION

10 BY MR. MORRISSEY:

11    Q.   Mr. Bennet, you mentioned -- when
12 defense counsel asked you questions, you mentioned
13 Ms. Rivero-Canchola or Sabrina said that
14 Classification put you in Division 10?

15    A.   Yes.  She said -- I don't believe she
16 said Class- -- well, I guess she did.  Class- -- I
17 was put in Division 10 from Classifications, and
18 Classifications was the only people that can move
19 me.

20    Q.   How do you know you were put in
21 Division 10 by Classification?

22    A.   That's what -- because she said that
23 was the only people that can move me.  I was
24 classified for Division 10 and I couldn't be moved

Page 73

1 unless Classifications moved me.

2    Q.   And where did you ask to be moved to?

3    A.   Division 8, RTU.

4    Q.   Did you specifically say RTU?

5    A.   I specifically said RTU because that's
6 where I normally be housed at.  On a few occasions,
7 I was housed in other spots.  But most of my stays
8 at Cook County Jail been in RTU.

9    Q.   I want to direct your attention to
10 Exhibit 1 and Grievance Guidelines and Summary of
11 Complaint.  Do you see that?

12    A.   Yes, sir.

13    Q.   And it says, "Your grieved issue must
14 meet all criteria listed below in order to be
15 assigned a control number, to be appealed, and/or
16 to exhaust remedies."

17         Do you see that?

18    A.   Yes, sir.

19    Q.   Do you see where it says -- can you
20 read the first sentence after that?

21    A.   "The grieved issue is not one of the
22 following non-grievable matters:  formulation of
23 departmental policies, inmate classification
24 including destination of an inmate as a security

EXHIBIT 1

Page 74

1  risk or protective custody inmate, or decisions of
2  the inmate disciplinary hearing officer."
3      Q.   All right.  What does that mean to you?
4      A.   I can't grieve where I'm at, where I'm
5  being housed at.  I can't grieve where I'm being
6  housed at.
7      Q.   Based on your experience, what happens --
8  what does that mean to you if you can't grieve
9  about something?
10     A.   If you can't grieve, you got to find
11 another way or just suck it up.  Like there's -- if
12 you can't grieve nothing, there's nothing that
13 could be done.  Like it's -- you SOL basically.
14     Q.   Why did you ask to go to the RTU?
15     A.   Because I know -- I've been there
16 before, and the showers there are much better
17 for me to shower.  Just everything is handicap
18 accessible, you know.  And you don't have to worry
19 about a lot of things that you have to worry about
20 in other divisions as far as people going to your
21 room taking your stuff.
22     Q.   Can you move without crutches in your
23 current condition?
24     A.   Minimal.

Page 75

1      Q.   All right.  What about when you were at
2  the Cook County Jail in 2018, could you move if you
3  didn't have crutches?
4      A.   Very minimal.
5      Q.   Describe how minimal -- strike that.
6           Describe how you would move if you
7  didn't have crutches when you were in the jail in
8  2018, the Cook County Jail?
9      A.   If I wasn't in jail?
10     Q.   If you were at the Cook -- strike that.
11          Describe how in 2018 you would move
12 minimally if you didn't have crutches.
13     A.   I could just hop.  If my knee feeling
14 up to it, I can hop from here to the counter to get
15 a cup of water maybe or something like that; hop
16 from this table to that table and sit back down or
17 something like that.  But that's about as far as it
18 goes.  I'm not fixing to keep on doing that.
19     MR. MORRISSEY:  I have nothing further.
20     MR. PESTINE:  I actually have further
21 questions.
22          FURTHER EXAMINATION
23 BY MR. PESTINE:
24     Q.   In Division 10, were there other

Page 76

1  inmates who used canes, crutches, or walkers?
2      MR. MORRISSEY:  I think this is outside of
3  the scope of my examination.
4      MR. PESTINE:  Yeah, but this is my
5  deposition, and I have further questions.
6      MR. MORRISSEY:  Yeah, I think usually it's
7  related to follow-up questions of what I would ask.
8  I only asked about -- you spent almost the entire
9  deposition talking about the grievance procedure,
10 and I only asked a follow-up question about the
11 jail's grievance procedure and how he could move if
12 he didn't have any crutches and the RTU.  So I
13 didn't really ask about all these other -- I think
14 you're opening up the door here to -- I think it's
15 somewhat improper.
16     MR. PESTINE:  Are you going to object to me
17 asking further questions at this deposition?
18     MR. MORRISSEY:  I'm going to object, yes.
19     MR. PESTINE:  Okay.  Well, I'm going to go
20 ahead and ask the questions.
21 BY MR. PESTINE:
22     Q.   Mr. Bennett, in Division 10, are there
23 other inmates -- and by the way, Pat, you did
24 discuss other inmates in Division 10.

Page 77

1      MR. MORRISSEY:  Whatever was said was said,
2  and we can figure that out.  I believe I only
3  talked about Mr. Bennett hopping around Division
4  10.  But ...
5      MR. PESTINE:  That was a later question.
6  BY MR. PESTINE:
7      Q.   But, Mr. Bennett, are there other
8  inmates in Division 10 that used canes, crutches,
9  or walkers?
10     A.   I believe so, yes.
11     Q.   Do all inmates who use cane, crutches,
12 or walkers have the same injuries?
13     A.   Of course not.
14     Q.   Are there inmates with canes, crutches,
15 or walkers who don't require a -- you know,
16 don't -- who don't use grab bars -- let's say
17 they're at a restaurant, who wouldn't use a grab
18 bar in a restaurant?
19     A.   I'm not sure.  I'm not -- I can't speak
20 on what another person would use.  I would assume
21 with my own understanding that if you have limited
22 mobility, you will want to use anything that's
23 going to help you mobilize better or station- --
24 station- -- be still better.

EXHIBIT 1

Page 78

1        So I can't speak for somebody else
2 on what they might do or anything like that.  But I
3 know I would.  I want to use them.
4     Q.   Would you think that it would depend on
5 the nature of their injury?
6     A.   If they have a -- if -- there are
7 devices that's being used.  If they have a cane
8 that they can use on their -- that they use on
9 their left side and the bannister, wherever they're
10 walking, only has a rail on their left side, they
11 can't use the rail.
12         If they got crutches in both hands,
13 how can they use -- like if they -- if they have
14 assistive devices like I do, I would assume that
15 they would use whatever is available for them to
16 access their life to make it easier.  I would
17 assume.
18     Q.   So people -- people who use walkers, do
19 they often use the walker to add grab bars?
20     A.   You --
21     MR. MORRISSEY:  You know what?  I object to
22 the form of the question.
23         You can answer if you -- go ahead.
24     THE WITNESS:  You -- from my experience, you

Page 79

1 don't want to be in that shower area with anything
2 that's rubber because it will be turned -- the
3 floor is like slippery.  So anything that hits that
4 floor, crutch, cane, walker, you're going to fall.
5 You're planting.  So you can't take none of that
6 stuff into the shower area with you.
7         So when you're in there, you don't
8 have nothing to rely on besides either a chair like
9 we -- like these guys are sitting in, which they
10 done gave me those before too, the chair that --
11     MR. MORRISSEY:  And just for the record, he's
12 talking about these plastic correctional grade
13 stationary chairs with four legs.
14     THE WITNESS:  Right.  And the chair that they
15 gave us to use with the small wheels on it, with
16 the netting back, with the PVC piping or in other
17 units, grab bars, and that would be the only thing
18 you will have outside of the benches.  The grab
19 bars and the benches, that was the only thing that
20 you will have to hold on to or to stabilize
21 yourself.
22 BY MR. PESTINE:
23     Q.   Did you speak to other inmates who
24 perhaps used a cane, crutch, or walker?  Did anyone

Page 80

1 tell you that they were having trouble toileting or
2 showering?
3     A.   I'm not the only one that fell in the
4 shower.
5     Q.   Okay.  Do you know who else?
6     A.   Not by name not right off, no.
7     MR. PESTINE:  Okay.  I have nothing further.
8         FURTHER EXAMINATION
9 BY MR. MORRISSEY:
10     Q.   You were asked by Mr. Pestine about the
11 shower again.
12     A.   Say it again.
13     Q.   You were asked about that shower that
14 was -- or you testified about that shower chair in
15 Division 10.
16     A.   Yeah.
17     Q.   Did you ever inspect that shower chair
18 or one of the shower chairs that you used?
19     A.   Yeah, I inspected it because I had to
20 get the serial number off of it.
21     Q.   Were there any signs on it?
22     A.   Yeah.  There was a sign of
23 manufacturing.  It was from Texas or somewhere, I
24 believe.  There was another sign on there that said

Page 81

1 Do Not Use Without Assistance.  I think that's
2 about it.
3     Q.   Did any correctional officer ever offer
4 you assistance in the shower area?
5     A.   No, sir.
6     Q.   Did any member of the nursing staff
7 ever offer you assistance in the Division 10 shower
8 area?
9     A.   No, sir.
10     MR. MORRISSEY:  Nothing further.
11     MR. PESTINE:  I have further questions.
12         FURTHER EXAMINATION
13 BY MR. PESTINE:
14     Q.   Mr. Bennett, did you ever ask for
15 assistance in the shower area?
16     A.   No.
17     Q.   Did you ever ask for assistance
18 toileting?
19     A.   No.
20     Q.   Were you ever denied the shower chair
21 or the toilet chair when you needed it?
22     A.   Yeah.
23     Q.   When were you denied that?
24     A.   It would be in use on another wing.

EXHIBIT 1

Page 82

1    Q.    Did you file a grievance about that?
2    A.    No.  I just waited on the chair.  Some
3 things can be resolved through the officers and a
4 little bit of patience.  So like I say, I don't
5 grieve every single thing.
6    Q.    Okay.  How many times did that happen?
7    A.    Me asking for a chair and it wasn't
8 available?
9    Q.    Yeah.
10   A.    Maybe a dozen.  Dozen or more.
11   Q.    Okay.  So -- and you were in Cook
12 County Jail, Division 10 for -- can you remind me
13 how long?
14   A.    From March 29th or March 30th to
15 July 20-something.
16   Q.    Okay.  So that was about four months?
17   A.    Maybe six.  Wait a minute.
18   Q.    All right.
19   A.    Yeah, you right.
20   Q.    So you said twelve times.  That was
21 total?
22   A.    That the chair wasn't available when I
23 needed it?  The chair wasn't available --
24   Q.    Yeah.

Page 83

1    A.    The chair wasn't available at all on
2 4D.  The chair was available off and on on 2B.  2B.
3         The second place that I was at, I'm
4 not sure if it was 2A or 2B, but it was like in
5 between those two because it will go from those two
6 back and forth.
7    Q.    Okay.  So in Division 10, tier 2B,
8 roughly how many times did you ask for the chair
9 and it wasn't there immediately?
10   A.    2B?
11   Q.    Yeah.
12   A.    Do you know if that's the first place I
13 was at or the second?  Because one I was only over
14 there for maybe a week or two or five days or
15 something.  One of them I was on there for -- I
16 moved from 2D to 2B to 2A, I believe.  Whatever --
17 the last wing I was on, that's the one I was on the
18 longest.  And I can check actually.
19         Okay.  Yeah.  2A.  2A is where it
20 was like maybe twice, maybe three times on 2A.  And
21 the rest of them was on -- that was on 2A, and then
22 the rest was on 2B.  And on 4D, only chair I was
23 given was one of those (indicating).
24         MR. MORRISSEY:  For the record, he's pointing

Page 84

1 to a plastic chair that we're sitting on for the
2 deposition that has four legs and doesn't have any
3 wheels on it.
4 BY MR. PESTINE:
5    Q.    How long were you in 2B?
6    A.    I'm going to say --
7         MR. MORRISSEY:  I don't want you to guess.
8         THE WITNESS:  I'm not sure totally.  I can
9 figure it out.  I could figure it out for you if
10 you need me to.
11 BY MR. PESTINE:
12   Q.    Okay.  Do you or don't you remember
13 roughly how many times you requested it and it
14 wasn't there right away or, you know, soon, the
15 shower chair in Division 10, tier 2B?
16   A.    Like I said, combined between 2B and
17 2A, about a dozen times with only about two or
18 three times being on 2B.  So nine or ten times.
19   Q.    Okay.  How long was the wait?
20   A.    Sometimes I had to wait to the next
21 shift because it wouldn't come till the next shift
22 or it be so close to the next shift.  But it could
23 be early as five minutes.  It could be early as
24 three minutes.  It might not be being used.  It

Page 85

1 might be just held on the other side.  But like --
2 yeah, that's about it.
3         And then it all depends on if the
4 officer that's working my tier is a normal officer
5 or he's just a backup officer.  Like my normal
6 officers, some of them, they'll -- soon as they see
7 me, soon as they come on, they'll be like, Okay,
8 I'm going to go get the chair for you so you'll be
9 ready to shower, without me even having to ask for
10 it.
11        But some officers I would have to go
12 ask because they not from the tier, and they be
13 like, What shower chair?  Where do I get it from?
14 And then I'll have to tell them they have to call
15 down to 2A, maybe they got it down on 2A, and then
16 it'll pop up within the next 10, 15, 20 minutes.
17        MR. PESTINE:  Okay.  I have nothing further.
18        MR. MORRISSEY:  I don't have further.  We'll
19 waive.  We're done.
20        (The deposition concluded at
21         3:10 p.m.)
22
23
24

EXHIBIT 1

Page 86

1
2                    REPORTER'S CERTIFICATE
3       I, Nick D. Bowen, do hereby certify that
    PRESTON BENNETT was duly sworn by me to testify the
4   whole truth, that the foregoing deposition was
    recorded stenographically by me and was reduced to
5   computerized transcript under my direction, and
    that the said deposition constitutes a true record
6   of the testimony given by said witness.
7       I further certify that the reading and
    signing of the deposition was waived by the
8   deponent's counsel.
9       I further certify that I am not a relative
    or employee or attorney or counsel of any of the
10  parties, or a relative or employee of such attorney
    or counsel, or financially interested directly or
11  indirectly in this action.
12      IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office at Chicago,
13  Illinois, this 12th day of April 2019.
14
15
                    _Nick D. Bowen_
16          Illinois CSR No. 084-001661
17
18
19
20
21
22
23
24

EXHIBIT 1

**0**

**03** 61:8

**04310** 26:13 29:6

**05003** 30:6

**05004** 33:5

**05252** 31:14

**05374** 38:9

**06345** 38:24

**06957** 56:8

**07094** 41:22

**07095** 46:17

**07322** 39:9

**07556** 47:4

**07557** 51:8

**08-** 47:18

**08142** 50:17

**08347** 52:2

**08458** 48:3

**08459** 53:4

**08958** 47:19

**09** 61:2,6,11,14

**1**

**1** 26:7,12 29:5 66:11,12 73:10

**10** 10:16 11:6 14:18 16:16,19 19:16,19 22:1,3,7,21 24:11,18 26:3 45:8 47:4 59:19,20 61:14 64:16 65:2,17 72:14,17,21,24 75:24 76:22,24 77:4,8 80:15 81:7 82:12 83:7 84:15 85:16

**1000248693** 42:6

**11** 47:17 48:2 61:14

**12** 50:16 61:14

**13** 51:7 61:4,7,14

**14** 52:1 61:5,7,14

**15** 53:3 64:13,24 65:16 85:16

**16** 56:7

**17** 6:20,24 7:1 64:7 65:24 67:10

**18** 7:1,7 10:20 58:3,7 66:9,10 68:20

**1807130** 64:8

**19** 7:6

**190** 59:21

**1996** 7:21,22 8:6 36:17,24 37:3

**1st** 8:6

**2**

**2** 30:5

**20** 85:16

**20-** 61:23

**20-something** 25:18 82:15

**200** 59:18,21

**2001** 60:18

**2002** 60:20 61:8

**2017** 6:21 10:18 61:18,20

**2018** 26:13 29:6 30:6 31:14 33:5 38:9,24 39:9 41:22 46:17 47:4,18 48:2,12,13,23 50:17 51:8 52:2 53:4 56:8 58:10 68:14 75:2,8,11

**20th** 48:12

**210** 59:22

**23** 7:24 8:2

**24th** 7:21

**25th** 48:13,23

**28th** 6:24 58:3,7

**29th** 6:24 10:17 68:19 82:14

**2A** 10:22 29:18 83:4,16,19,20,21 84:17 85:15

**2B** 10:22 29:18 64:16 65:2,18 83:2, 4,7,10,16,22 84:5,15,16,18

**2D** 83:16

**3**

**3** 31:13

**304** 28:9

**30th** 10:18 82:14

**352** 28:9

**3:10** 85:21

**4**

**4** 33:4 37:13 47:22

**4/18** 33:3

**4D** 10:22 29:17,24 83:2,22

**4th** 68:13,22

**5**

**5** 38:8 48:6 53:13 55:16

**5/11/18** 33:19

**5/5** 33:3

**6**

**6** 38:23

**7**

**7** 39:8 44:21 45:1,6,15,18 47:14

**8**

**8** 41:22 44:21 45:6,15,18 73:3

**9**

**9** 44:21 45:6,15,18 46:14 47:14,19

**97** 60:18,20 61:8

**A**

**above-the-knee** 8:2,11

**absolutely** 26:5

**access** 27:10 78:16

**accessibility** 54:24

**accessible** 15:20 22:8 54:20,22 55:16 74:18

**accessories** 30:13 31:2,6,8

**accident** 6:15

**accommodation** 23:24 24:10 25:1

**accommodations** 24:21 34:23 35:17 38:7,21

EXHIBIT 1

**account** 22:12

**actual** 44:1 49:20

**ADA** 20:3,18 29:20,22 30:16 31:22 32:24 33:12,17 34:2,12,15 42:11, 17 53:10,24

**add** 78:19

**addressed** 33:21 39:17

**addressing** 26:18 45:5 54:16

**adjacent** 55:20

**advise** 59:19

**advised** 34:2,12

**afforded** 24:2,22

**afterward** 28:17 29:3

**age** 56:19

**agreeing** 28:18

**ahead** 4:8 23:4 28:15 35:5 76:20 78:23

**allowing** 55:19

**Alvarez** 53:16

**Alvaro** 53:18

**ambulating** 9:18 33:23

**amputated** 7:17 8:4,5 36:24

**amputation** 8:2

**amputee** 7:12 8:11

**and/or** 73:15

**ankle** 11:8,23 56:20

**answering** 15:6

**answers** 4:12

**apiece** 6:13

**apologize** 18:4

**appeal** 34:9,11

**appealed** 73:15

**apply** 45:1

**April** 68:14,22

**area** 17:2 79:1,6 81:4,8,15

**argument** 55:5

**armrests** 19:6,7,9,10,13

**arrest** 57:14

**arrested** 57:8,22,24

**arrive** 10:16

**arriving** 11:6

**asks** 54:1

**assigned** 50:1 73:15

**assistance** 24:1 81:1,4,7,15,17

**assistant** 30:14

**assistive** 78:14

**assume** 5:3 37:3 49:1 77:20 78:14,17

**attached** 65:7,22

**attention** 73:9

**attorney** 27:4 50:1

**attorney's** 26:24 27:3

**August** 7:21

**aware** 56:18

---

### B

**back** 5:14 17:6 19:3,12,13 39:24 43:8,13,15,16 44:18 45:4,24 54:14 57:1,9,18 65:1,12,17 75:16 79:16 83:6

**background** 5:8

**backup** 85:5

**bad** 53:19

**balance** 63:21

**bannister** 78:9

**bar** 16:8 18:19 36:6,9,14 37:9 77:18

**bars** 14:18 15:10 17:17 21:14,15 22:1 32:12 34:18,20 35:2,10,15,16, 21 37:5 38:18 39:5 40:8 41:4,11 50:13 51:5,22 52:24 54:9,20 55:14 62:21,22,23 66:1 70:8,11 77:16 78:19 79:17,19

**based** 48:10 59:14 74:7

**basement** 55:15,21

**basically** 14:23 17:18 18:7 21:6 29:17 40:2 44:22 45:2 62:19 64:23 65:10,15 67:24 68:22 74:13

**Bates** 26:15,17 27:22

**bathroom** 15:22,23 18:15 35:2,10, 21,24 36:2

**bathrooms** 37:4

**beginning** 6:20,21

**believed** 51:14

**bench** 18:16 19:23 32:19 66:2

**benches** 20:10,17 21:3,15 22:1 39:5 40:8 41:4 50:14 51:5,23 53:1 54:7 70:11 79:18,19

**Bennet** 72:11

**Bennett** 4:7,10,11,17,19,24 5:6 7:3,11 15:2 28:9 29:7 30:16 32:11 33:18,21 35:1 39:4 44:4 46:9 49:9, 13,24 50:10 52:11 55:10 56:10 58:16 76:22 77:3,7 81:14

**Bennett's** 26:20 49:24

**big** 60:21

**birthday** 8:6,7

**bit** 7:10 15:5 23:6 25:23 26:17 46:15 57:23 67:11 82:4

**blinked** 8:22

**blowing** 56:19

**blue** 19:2,12

**body** 10:6 59:15

**booked** 68:19

**bottom** 19:1

**bought** 68:17

**braces** 11:8

**brand** 58:23 59:7,8,10

**break** 27:8,11 45:3 58:9,11,16

**breaks** 15:12

**brings** 50:2

**broader** 14:7

**broke** 44:23

**broken** 40:16,19 41:11,17 42:20 43:4,15 44:2,15 45:16,19 46:4,22 67:23 71:2,8,15

**brought** 43:15

**bug** 50:23

**build** 61:22

**building** 70:21

**bullpen** 54:1 55:20

**bunch** 11:9 22:2

EXHIBIT 1

## C

**C/o** 40:17

**calendar** 64:14

**call** 30:19 50:4 53:12 60:10 85:14

**called** 4:20

**camera** 68:23

**Canchola** 37:15,17 42:8

**cane** 11:22 62:21,23 63:19,23,24 64:1 77:11 78:7 79:4,24

**canes** 11:9 76:1 77:8,14

**care** 68:4

**cared** 14:6

**case** 23:7 27:14,22 28:7,14,24 29:14 30:17 32:3,6 50:2,4 52:10 56:3

**CCDOC** 56:14 64:16

**cell** 15:23 21:14 54:19 68:5,15 69:3,8

**cell-** 67:16

**cellmate** 66:22,23 68:3

**cellmates** 67:16,17

**cells** 14:18 54:21 70:8

**Center** 5:16 25:11,15

**Cermak** 24:17

**chair** 16:21,22,23,24 17:6,9,12 19:12,13,21 32:20 41:17 42:4,8,9, 12,13,15,19 43:3,6,8,12,18,24 44:2,5,6,8,10,12,13,15 45:8,17,19, 22 46:3,22,24 67:23 71:1,2,7,9,13, 15,18,20,21,22 79:8,10,14 80:14, 17 81:20,21 82:2,7,22,23 83:1,2,8, 22 84:1,15 85:8,13

**chairs** 18:22 21:3 38:18 41:4,12 42:10,17 43:11 45:1 54:7 71:4,11 72:2 79:13 80:18

**characterization** 48:16

**characterized** 22:9

**charged** 6:22

**charges** 67:2

**check** 83:18

**Chicago** 5:19,20,21

**child** 6:5

**claim** 23:7,9,12 29:14,20,22 30:17 52:8,10

**claiming** 44:12

**claims** 32:3

**clarify** 52:17

**clarifying** 28:11

**Class-** 72:16

**classification** 23:1 72:14,21 73:23

**Classifications** 72:17,18 73:1

**classified** 72:24

**clear** 52:11

**client** 13:2

**climbing** 10:14

**close** 84:22

**closest** 16:2 18:11

**combined** 84:16

**comment** 27:12

**commissary** 68:14,16,19,21 69:1, 4,5

**commit** 10:4

**company** 6:15

**compare** 66:12

**complain** 43:12

**complaint** 33:19 73:11

**completely** 22:10

**compliance** 20:10,18,22 31:22 32:14 33:17 42:11,17

**complicated** 6:5

**comprehensive** 45:7

**concerned** 26:17

**concerns** 42:10,16

**concluded** 85:20

**conclusion** 30:19 32:5

**conclusions** 55:4

**condition** 15:11 74:23

**conditions** 22:8 67:22 68:1 70:15

**confused** 26:18

**consists** 38:2

**contact** 31:21 32:24

**contacted** 24:3,22

**continue** 18:5 28:10,16

**continued** 4:2

**continuing** 5:1 29:5

**control** 26:12 29:5 30:6 31:14 33:5 38:9,24 39:9 41:22 46:16 47:4,18 48:2 50:17 51:8 52:2 53:4 56:8 64:7 73:15

**convict-** 9:13

**convicted** 6:23 9:12,18 10:13

**convictions** 9:14 10:11

**Cook** 4:5 12:24 13:6,8,15,21 14:6 17:14,15,21 18:13,23 23:22 26:3 34:14 39:23 44:16 56:22 62:12,13, 14 64:19 69:12,18 73:8 75:2,8,10 82:11

**copy** 40:2 66:11

**correct** 33:14 37:1 38:16 41:19 42:13,23,24 45:17 48:14 51:2,14 53:16,22 64:16 66:15

**correctional** 25:11,15 28:12 79:12 81:3

**correctly** 33:11

**counsel** 12:22 56:1 72:12

**counter** 75:14

**County** 4:5 12:24 13:6,8,15,21 14:6 17:14,15,21 18:14,23 23:22 26:3 34:14 39:23 44:16 56:22 62:13,15 64:19 69:13,18 73:8 75:2, 8 82:12

**court** 4:15 23:14 24:11,16 29:16 48:9 53:11,12,13 54:2,5 66:22,23

**courtroom** 50:3 55:20,21

**cover** 45:6 70:17

**crime** 6:23 10:7,13

**crimes** 10:4,9

**criteria** 73:14

**crosscheck** 28:1,17

**crutch** 64:4 79:4,24

**crutches** 11:3,8,13,21 12:7,12,14, 20 15:24 16:1,6,7,23 17:22 18:10, 16 23:18,19,20 33:20 36:3,5,7,13

63:4,17 74:22 75:3,7,12 76:1,12
77:8,11,14 78:12

**crutching** 55:18

**CRW** 42:11,18 65:1,17

**cup** 75:15

**current** 74:23

**custody** 14:6 74:1

**cut** 57:23

---

**D**

**Dart** 4:4

**date** 12:23 40:15 41:15 44:21
48:11,20 49:5,19,20 52:5 53:13
57:14 66:21

**dates** 6:19 9:4 10:23 11:2 48:9
49:22 52:3,11,14 60:9,11,12,15,17

**Davis** 30:14

**day** 4:2 12:4 48:17 65:6,21 68:21

**dayroom** 16:4,23

**days** 25:21 30:12 60:14 64:14,24
65:16 83:14

**deaf** 31:24

**dealing** 30:13

**decisions** 74:1

**defendants** 4:4

**defense** 72:12

**deflected** 68:12

**delay** 15:5

**denied** 22:12 81:20,23

**dentist** 52:20

**departmental** 73:23

**depend** 78:4

**depending** 12:4 16:2 69:22

**depends** 85:3

**deposition** 4:1 26:7 27:5 56:4
76:5,9,17 84:2 85:20

**depth** 13:22 14:2,13

**describe** 18:12,22 21:4 23:11
75:5,6,11

**destination** 73:24

**detail** 31:5

**details** 31:7

**detained** 64:15

**detainees** 50:2

**determine** 28:2

**devices** 11:5,17 78:7,14

**difficult** 4:14 55:17

**difficulty** 33:20,22 64:12

**dinner** 50:24

**direct** 73:9

**disabilities** 15:21

**disability** 32:17 33:11,13

**disagree** 55:24

**disciplinary** 74:2

**discomfort** 23:13

**discuss** 13:3,9 14:8 32:2 76:24

**discussed** 13:11 14:11,13 46:15
47:14 66:19

**discusses** 64:12

**discussing** 65:2,18

**disposal** 70:21

**disregarding** 53:14

**distance** 24:13

**distances** 33:20

**Division** 10:16 11:6 14:18 16:15,
19 19:16,19 22:1,3,7,21 24:11,18
26:3 29:16 45:8,11 48:6 53:13
55:16 64:16 65:2,17 72:14,17,21,
24 73:3 75:24 76:22,24 77:3,8
80:15 81:7 82:12 83:7 84:15

**divisions** 74:20

**Dixon** 25:11,13,15,22 49:18

**DOC** 50:2 64:19

**doctor** 57:1

**document** 33:5

**documents** 26:18 28:6,8

**door** 69:9 76:14

**dozen** 82:10 84:17

**drive** 6:18 8:13,16

**driving** 8:10,18 11:18,19

**drove** 6:9

**Drugs** 9:16 10:10,12

**due** 11:24 40:16 41:11 46:22 48:6
56:19 59:23

**duly** 4:20

---

**E**

**early** 84:23

**ears** 31:24

**easier** 8:15 78:16

**eating** 33:22

**education** 5:10

**elbow** 11:9,11,14,24

**elbows** 11:15

**Eleventh** 5:11,12,13

**encounter** 38:14

**encountered** 37:4

**end** 67:3

**entire** 27:1 76:8

**environment** 22:11

**equipment** 40:16,20

**establish** 56:2,3

**eventually** 44:4

**exact** 6:19 9:4 11:2 12:23 49:20

**examination** 4:22 54:15 72:9
75:22 76:3 80:8 81:12

**examined** 4:21

**exhaust** 73:16

**exhibit** 26:7,12 29:1,5,9 30:5,9
31:13,17 33:4,8 37:13 38:8,11,23
39:2,8,11 41:21 42:1 44:21,24
46:14,19 47:4,6,17 48:2 50:16,19
51:7,10 52:1 53:3,6 56:7,11 64:7,
10 65:24 66:6,9,10,11,12 73:10

**exhibits** 27:23 47:14

**exist** 56:2

**experience** 67:7 74:7 78:24

**expiration** 52:4,11,14

**explain** 55:7 58:22

**explained** 21:10

EXHIBIT 1

**explaining** 53:9

**extent** 21:17 30:18 32:4

**extra** 63:21

---

**F**

**facility** 28:12 70:20

**fact** 14:2 46:5 54:24 62:5 64:23 65:15 68:2,3,8

**facts** 56:2

**fair** 39:14 69:17

**fall** 40:13 41:11 44:10 45:19,20,22 47:10,11,12,13,15,16 79:4

**falling** 46:22

**familiar** 36:17 37:8

**family** 6:3

**fashion** 65:3,19

**fears** 52:12,17

**feasible** 64:20

**feeling** 75:13

**fell** 31:24 71:8,15,23 80:3

**felony** 9:13

**felt** 32:15

**figure** 77:2 84:9

**figured** 70:17

**file** 21:24 24:4 27:11 69:18,20,24 70:24 71:3 72:2 82:1

**filed** 22:2 24:7 26:2 46:9 55:10 67:2,10,13 72:4

**fill** 62:3

**find** 8:15 74:10

**finding** 67:17

**finish** 16:18 17:5 18:19

**finished** 15:3,6

**fit** 60:8 61:10 64:20

**fitted** 59:18 64:15

**fitting** 59:22 60:4,6

**fittings** 61:24

**fixed** 19:23 20:10,17 21:3,15 22:1 32:19 39:5 40:8 41:4 42:5 43:14,17 44:1 50:14 51:5,22 53:1 54:7 66:2

**70:11 71:7,9,13

**fixing** 75:18

**floor** 43:12 79:3,4

**flop** 64:2

**fluctuates** 60:1

**fluctuation** 62:2

**fluoride** 52:13

**follow** 69:11

**follow-up** 76:7,10

**food** 67:19

**foot** 18:17 19:4

**form** 9:19 16:9 36:18 70:1 78:22

**formulation** 73:22

**found** 50:23 62:11

**foundation** 49:9

**frequent** 17:18

**fresh** 15:12

**friend's** 57:10

**front** 11:1

**frozen** 57:18

**full** 27:20,21 28:2

**fully** 34:16

**function** 64:3

**funding** 56:17

**furthest** 5:9

**future** 42:9,16

---

**G**

**gap** 60:21 61:2,9 62:3

**gave** 24:13 28:4 55:18 59:4 65:5, 20 71:13 79:10,15

**GED** 5:11,14

**general** 12:18 21:13,22 38:2 44:13

**generally** 8:15 12:5 13:3 19:20 22:10 67:9 70:16

**generated** 49:8

**girlfriend's** 18:1,7 57:9

**give** 17:8,11 25:1 53:12

**giving** 31:1

**good** 44:19 62:9,12 67:7 69:16

**grab** 14:18 15:9 16:8,24 17:17 21:14,15 22:1 32:12 34:17,20 35:2, 10,15,16,21 36:6,9,14 37:5,9 38:17 39:5 40:8 41:4,11 50:13 51:4,22 52:24 54:9,20 55:14 62:21,22,23 66:1 70:7,11 77:16,17 78:19 79:17, 18

**grade** 5:11,12,13 79:12

**great** 8:7

**grew** 12:8 57:4

**grievance** 21:24 24:4 29:13,15 30:24 31:16,19 32:1,11,18 33:10 34:1 38:13 39:4,17,20,22,24 40:2, 3,7,21 41:2,3,14 42:3 43:2,20,21 44:11,18,19,22,24 45:3,24 46:6,12, 21 47:2,8 48:5 50:10,13,21 51:4 52:18,21 53:8 54:6,13,23 56:12 64:14,19,22,24 65:7,15,16,21,24 67:12 68:12,24 69:1,4,19,21,24 70:3,5,7,10 71:1 72:2 73:10 76:9, 11 82:1

**grievances** 22:2 24:7,8 25:24 26:2,21,22 27:1,13,21 28:13,21 45:6,13,15,18 46:10,23 55:10,13, 22 67:9,11,15 70:2 71:3 72:4

**grieve** 39:23 70:14 74:4,5,8,10,12 82:5

**grieved** 70:9 71:16,17,23 72:5 73:13,21

**grieving** 39:15 43:3

**guarantee** 28:20

**guess** 46:13 66:3,4 72:16 84:7

**Guidelines** 73:10

**gunshot** 7:18

**guys** 79:9

---

**H**

**half** 58:21

**handicap** 8:19 22:9 74:17

**handicap-accessible** 20:19 22:11

**handicaps** 70:22

**handle** 45:16 46:22

**handling** 33:16

**hands** 78:12

**happen** 20:6 69:15 82:6

**happened** 7:16 20:6 67:6

**happening** 59:14

**hard** 21:6 53:18

**head** 4:14,15

**hear** 7:19 8:22 57:15

**heard** 13:20 44:23 45:3 52:10,20 70:1

**hearing** 74:2

**held** 48:6 54:19 55:1 85:1

**helped** 69:12

**high** 5:15

**history** 6:17

**hits** 79:3

**hold** 16:24 17:4 19:8,10,11 55:21 79:20

**holding** 18:19 54:19,21

**home** 17:24 18:6,7,9

**homeless** 57:8

**hop** 75:13,14,15

**hope** 69:15

**hopping** 77:3

**Horizons** 5:16

**hotel** 34:20 35:4,20

**hotels** 34:19 35:24

**house** 18:1 25:15,20,21 57:10

**housed** 15:10,13 29:23 33:11 73:6,7 74:5,6

**housing** 21:9,10,12,22 22:4,6,8,10 31:22 34:2,12,15 38:2 70:9,16,18 72:5

**Houston** 5:24

**hurt** 40:16

**hurting** 60:22

---

**I**

**identified** 27:2

**IDOC** 48:10,13,19 49:2 52:7 53:21, 22

**Illinois** 5:19 57:2,10

**immediately** 83:9

**improper** 76:15

**incarcerated** 8:21,23 9:1,7 68:20

**incarceration** 12:24

**incident** 40:4,12,16,18 41:9,10 45:20,21 52:3

**included** 21:10 67:4

**including** 73:24

**indicating** 83:23

**individual** 21:4

**inefficient** 46:1

**information** 14:15

**informed** 40:17 50:2 66:24

**injuries** 15:1 77:12

**injury** 78:5

**inmate** 13:15 48:17,19,24 50:22 54:3 67:1 68:13 69:9 73:23,24 74:1,2

**inmates** 13:4,8 14:17,20,24 76:1, 23,24 77:8,11,14 79:23

**inside** 44:18

**inspect** 80:17

**inspected** 80:19

**insufficient** 44:13

**interest** 60:22

**Internet** 10:7

**interrupted** 18:4

**interview** 32:14

**involved** 9:18 10:9

**involves** 10:6

**Iron** 6:2,4

**issue** 40:5 44:17,20 69:20 73:13, 21

**issues** 39:16 44:23 45:5,7,16 46:2, 3 51:12 69:18

**J**

**jail** 13:6,8,16,21 17:14,15 18:14,23 26:3 34:14 56:22 62:13,15 69:18 73:8 75:2,7,8,9 82:12

**jail's** 76:11

**judge** 50:1 54:1

**July** 25:18 48:12,13,23 82:15

**jumping** 69:4

**K**

**kind** 14:24 59:15

**knee** 7:15 11:8,24 56:20 75:13

**knew** 22:23 69:18

**knowledge** 19:24

**L**

**lack** 15:9 21:16 31:1,3 32:12 34:24 39:15,18 40:4,12 41:10,11 45:1,20 47:9 56:17 70:3

**late** 7:5 41:2

**latest** 6:23

**lawsuit** 13:13,17,19 14:14

**lawsuits** 13:4,9,21,23 14:9

**lawyer** 48:8 53:11,14 54:4

**learn** 13:1

**left** 7:14 8:14 71:14 78:9,10

**leg** 7:14,15,17 8:3,4,5,13 11:13 36:24 58:23,24 59:1,2,4,7,8,9,11, 23 61:9 63:2

**legal** 30:19 55:4

**legs** 8:16 79:13 84:2

**Leighton** 23:7 25:2,4 38:21 39:5 40:9 41:5 50:11 51:5,19 52:22 54:11,21 55:17 66:1 70:4

**Leighton's** 54:20

**let all** 44:23

**letters** 49:21

**level** 5:10

**Lieutenant** 53:16

EXHIBIT 1

life 5:21 6:8 57:7 78:16

limb 56:13,18,21 57:12,20 58:17 59:13,19,24 60:2 64:13,15,21

limbs 58:19 60:10 62:17

limited 77:21

list 26:1 27:21 28:2

listed 73:14

lived 5:21,23

living 8:1 67:21 68:1 70:14,15

located 25:10

location 35:14,15

locations 17:17

locked 7:9

long 24:12,13,15,16,18,19 33:20 37:18,19 38:1 48:7 68:20 82:13 84:5,19

long-distance 25:5

longest 83:18

looked 69:6

lose 52:12 62:3

losing 57:6 59:15

loss 67:5

lost 60:22 62:8

lot 9:8 14:5 24:8 37:6 56:16 57:6,7 74:19

lotion 31:11

low 19:11

lower 15:24 16:6

**M**

made 57:1

mail 49:15,17,18

mailbox 65:6,21

mailed 48:12,19 53:22

mailing 6:15

main 18:8

make 20:6 24:15 37:11 54:22 59:3 78:16

makes 54:3

making 27:12 55:4

maneuver 36:15

manufacturing 80:23

March 6:24 7:5,6 10:17,18 58:3,7 68:20 82:14

marked 26:6,24 27:4 28:24 33:5 47:4 66:11

markings 27:5

Marquette 60:24

matters 73:22

Mccarthy 56:17

meal 50:22

mealtime 51:13

medical 23:5 33:21 69:23

medication 30:12 31:2,5,8 47:9

meet 12:21

meet all 73:14

member 81:6

mention 32:12,19 41:4

mentioned 38:4,7 59:12 72:11,12

met 35:18

Michigan 6:1,2,4 57:1,2,10 61:1

midst 10:5

mile 24:12,18

mine 6:6 18:1 53:19

minimal 74:24 75:4,5

minimally 75:12

minute 29:7 37:14 38:10 82:17

minutes 84:23,24 85:16

mischaracterizes 20:13 21:18 39:20 45:10

misleading 54:15,17,18,22 55:8,9, 23 56:5

missing 68:14

mobility 77:22

mobilize 77:23

moment 37:12

month 6:12,16

months 6:1,10 57:13,21,22 62:14 82:16

Morrissey 4:8 7:2 9:19 12:22 15:2 16:9 20:12 21:17 24:3,22 26:14,22 27:9,17,24 28:3,18,23 30:18 32:4 35:6,11 36:18 39:19 45:9,12 47:22 48:15,22,24 49:7 54:12,18 55:6,12 58:5,8,11 65:11 66:4 72:8,10 75:19 76:2,6,18 77:1 78:21 79:11 80:9 81:10 83:24 84:7 85:18

Mountain 6:2,4

move 22:24 23:1 30:5 31:13 37:20 53:7 72:18,23 74:22 75:2,6,11 76:11

moved 10:24 17:24 20:19 22:11,14 25:18,20 29:17 31:23 37:18 70:20 72:24 73:1,2 83:16

movement 10:6

moving 18:2

Multiple 7:18

**N**

named 53:16

narrow 54:23 55:22

narrowly 55:14

nature 20:20 23:11 36:15 41:12 78:5

NC 64:7

needed 17:20 25:4 54:4 56:19 81:21 82:23

needing 31:11 62:6

neglected 40:17

netting 19:2,12 79:16

nice 61:2

nods 4:15

non- 46:1

non-grievable 73:22

normal 85:4,5

note 39:15

notice 4:2 35:17

noticed 50:23

NRC 25:14,19

number 29:6 44:2 46:9 55:12 71:16,18,20 73:15 80:20

EXHIBIT 1

nursing 81:6

## O

object 9:19 16:9 21:17 30:18 32:4 48:15 54:12 76:16,18 78:21

Objection 20:12 35:11 36:18 39:19 45:9

occasions 73:6

occur 7:20

offer 81:3,7

office 26:16,23,24 27:10 28:3,6,12

officer 16:20 17:7 19:22 20:3,10, 11,18,22 22:13,15 24:24 25:3 31:22 32:14,24 33:18 42:11,18 67:2 69:9 71:5 74:2 81:3 85:4,5

officers 17:8,11 19:15,18 20:1,7,9, 16 22:17,18,21 25:6 38:15 82:3 85:6,11

ongoing 13:4

onward 37:3

opening 76:14

operates 44:17

opportunity 54:5

options 23:22

orally 4:13

order 30:12 37:10 68:21 73:14

orders 42:4 43:23 71:6

originally 5:18

other's 13:9

outdated 52:4

overlook 67:3

owned 69:3

## P

p.m. 85:21

pain 11:24 23:13 33:19 47:10

Paladin 40:17

paperwork 9:5

part 21:22 34:1,5 41:13

partially 59:8,10

parties 50:3

passed 14:16

Pat 27:20 47:24 76:23

patience 82:4

Patrick 12:22

pause 26:8

PD 49:24

peers 69:11

pending 14:3

people 8:15 10:4 14:5,8 15:11,12 20:5 68:5,6 70:22 72:18,23 74:20 78:18

people's 53:19

period 21:9 22:6 69:2 72:5

permit 25:6 48:7

person 32:16,17 77:20

personnel 33:16

pertain 67:24

pertaining 67:21

pertains 41:6

Pestine 4:1,3,11,23 7:4 10:2 15:16 16:14 20:21 21:23 26:10,20 27:7, 15,20 28:1,16,22 29:2,4 30:22 32:9 35:8,19 36:22 40:6 45:14 47:23 48:18,23 49:4,12 54:17 55:3,6,9,24 56:6 58:10,13,15 65:13,23 66:5 72:7 75:20,23 76:4,16,19,21 77:5,6 79:22 80:7,10 81:11,13 84:4,11 85:17

physical 15:1

physically 41:6

physician 30:13

piece 49:15,17,18

pieces 59:9,11

piping 19:14 79:16

place 6:12 53:10 83:3,12

places 6:12 12:17 17:19,23 18:8

Plante 53:9

planting 79:5

plastic 79:12 84:1

plates 8:19

plea 53:14

point 12:19 25:7

pointing 83:24

police 69:21,23

policies 73:23

pop 85:16

popped 69:9

possibly 67:19

post 49:22

postdated 65:4,19

pounds 59:18,20

prep 48:8

prepared 66:22

prescribed 31:3 47:9

presence 49:24

presort 6:14

Preston 4:7,10,19 54:4 68:15,17, 19

pretty 21:20

previous 43:19 46:23

previously 8:20,23

prior 8:24 11:5 18:13 39:18 49:5 59:9,11 68:21

problem 21:16 32:23 44:14

problems 21:5,13 32:19 50:21

procedure 76:9,11

proceeded 54:5

process 16:16 17:6,13 18:13,20 36:16 37:8 48:7 62:17 63:5

produced 26:16 27:13 28:7,9,14, 24

proof 68:18

property 66:24 68:4,8 69:2

prosthesis 11:19,23 12:7,8 36:4, 8,12

prosthetic 58:17,19 62:17,21 63:15,17,20

prosthetics 11:9

protective 74:1

protheses 8:17

EXHIBIT 1

**prothesis** 36:4

**provide** 68:18

**purchased** 68:18

**pursuant** 4:2

**push** 25:6

**put** 16:23 18:16 42:3 43:23 45:23 46:6 68:5 70:5 71:5,6 72:14,17,20

**putting** 43:19

**PVC** 18:24 19:14 79:16

---

**Q**

**question** 5:2,3 9:20 10:1 15:7 16:10 32:8 35:6 36:19,21 49:5,11 57:19 76:10 77:5 78:22

**questions** 4:12 5:7 7:2 54:13,16, 23 55:7,22 72:8,12 75:21 76:5,7, 17,20 81:11

**quicker** 34:18

**quote** 52:19

---

**R**

**rail** 78:10,11

**raise** 16:3,5

**ramp** 23:8,15,17,22 24:1,16 25:2,4, 7 38:21 39:6 40:9 41:5 50:11 51:5, 20 52:22 54:11,21 55:14,18 66:1 70:4

**random** 22:18

**range** 57:5

**rations** 52:3

**read** 38:10 39:1,10,12 41:24 42:14 46:18 47:5 50:18 51:9 53:5,19 56:9 64:9 65:12,14 66:17,18,20 73:20

**reading** 48:21

**ready** 50:3 85:9

**reason** 11:16 54:19 55:1,2,15

**rebuild** 58:24 59:2

**recall** 7:3 19:17 33:24

**receipt** 68:16

**receive** 68:21

**received** 48:13,16,20 49:6,17,18

**recent** 6:9

**recently** 61:16

**recess** 58:14

**record** 26:14 27:16 49:8 65:14 79:11 83:24

**recreation** 12:16,17

**red** 56:16

**refitted** 61:10 62:10

**reflect** 69:6

**refused** 53:12 70:23

**regard** 45:16

**relate** 39:5 40:8 51:4,19,22 52:21, 24 54:6,9,11 55:10 66:1

**related** 38:17,20 54:24 76:7

**relevant** 29:14 30:16 32:2,5 52:8,9

**rely** 79:8

**remain** 53:24

**remedies** 73:16

**remember** 10:23 34:5 60:12 67:12 84:12

**remind** 82:12

**removed** 66:24

**repeat** 17:5 18:20 32:8 58:4,6 65:8

**rephrase** 5:2 10:1 36:21

**replaced** 42:5,9,15,22 44:1 47:1 71:2,22 72:1

**reply** 64:14,24 65:16

**report** 4:15 39:16,18 40:5,18 45:20,21

**reported** 41:10

**reporter** 4:15

**representing** 4:4

**request** 42:10,17

**requested** 84:13

**requests** 42:4 43:19,23 71:6

**require** 77:15

**reshape** 59:13 60:5

**resolve** 69:24

**resolved** 82:3

**respond** 42:19

**response** 30:12 33:15 34:1 37:14 42:7 43:8 48:10,11,20 49:5,14,23 52:7 53:15,24 64:18 65:4,19

**rest** 83:21,22

**restate** 48:1

**restaurant** 35:1,9 77:17,18

**restaurants** 34:17 35:23

**result** 45:19

**retractable** 19:4

**return** 53:13

**returned** 66:23

**reverse** 17:6 18:21

**reviewed** 68:23

**reviewing** 29:9 30:9 31:17 33:8 38:11 39:2,11 42:1 46:19 47:6 50:19 51:10 53:6 56:11 64:10

**revolved** 22:6

**rid** 44:6

**rights** 34:3,12,15

**rinse** 17:5 18:20

**risk** 56:19 74:1

**Rivero-** 37:14,16

**Rivero-canchola** 20:23 33:17 72:13

**roach** 67:18,19

**rock** 51:14,16,17,18

**rocks** 67:17

**room** 74:21

**roughly** 7:24 8:1 25:16 83:8 84:13

**RTU** 15:15 20:19 22:12,14,16,24 31:23 73:3,4,5,8 74:14 76:12

**rubber** 79:2

**running** 10:5

---

**S**

**Sabrina** 20:22 21:1 23:2 33:17 42:8,14 72:13

**safe** 52:14

**salad** 51:14 67:18

**school** 5:13,15

EXHIBIT 1

scoot 16:24

scooter 17:1

scope 76:3

screen 57:17

seat 19:1,2

security 73:24

seek 61:21

self-explanatory 31:4

send 39:24 44:18

sense 54:3 59:3

sentence 73:20

separate 40:1

September 8:6

Sergeant 53:9

serial 44:1 71:16,18,20 80:20

series 4:12

serve 16:7

services 48:17 49:1

setup 62:1

shakes 4:15

shaking 4:14 57:18

Sheriff 4:5

sheriff's 26:23

sheriffs 23:23

shift 84:21,22

shirts 67:4

short 27:8,11

shortly 41:2

shot 8:5 11:14

shoulder 33:19 37:24 56:20

show 68:17

shower 17:2,9,10,11 18:22 19:21
  21:3,15 30:2 32:20 36:1,11,12
  38:3,18 40:13 41:4,12,17 42:5,8,
  10,15,16 43:3,6,8,11,12,24 44:12,
  13,15 45:1,7,16,19,22 46:3,22,24
  47:12 54:6 63:3,5,7,9,10,11,12
  67:23 71:1,2,3,7,9,12 72:2 74:17
  79:1,6 80:4,11,13,14,17,18 81:4,7,
  15,20 84:15 85:9,13

showering 16:15,17 18:12,13

19:19 33:22 37:23 62:18 63:1 72:3,
5 80:2

showers 20:17,20 21:7,21 38:6
  70:13 74:16

side 78:9,10 85:1

sign 80:22,24

Signature 48:19

signatures 53:19

signs 25:8 80:21

simple 64:23 65:15

simply 10:6

single 82:5

sir 4:17 5:5,22 7:13,23 8:12 51:15,
  21,24 52:23 53:2 73:12,18 81:5,9

sit 17:3 18:16 62:22,24 75:16

sitting 10:8 11:20 18:18 64:1 79:9
  84:1

situated 55:15

skateboard 17:1

sleeves 11:9,11,23

slide 16:22

slippery 79:3

small 19:3,5 79:15

SN 42:5

socks 62:1,3,6,7

SOL 74:13

someone's 18:9

sort 6:5 64:3

sound 67:7

sounds 38:14

speak 14:24 19:15,22 23:6 27:15
  37:16,22 44:17 53:10 55:13 67:8
  69:5,21,23 77:19 78:1 79:23

speaking 15:4 22:10 44:20 56:4
  58:17

speaks 39:20 54:13

special 8:17,19

specific 14:4 71:18

specifically 9:15 14:10 21:8,13
  22:5 32:19 38:4 40:7 41:3 70:10,12
  73:4,5

spent 76:8

spoke 19:18 20:3,5,11 33:18 37:24
  38:1 68:13 70:16

spoken 14:17 25:23

spots 73:7

stability 34:19

stabilize 79:20

stack 22:4

staff 67:4 69:23 81:6

stamp 26:15 49:2

stamped 26:17 27:22

stand 17:4 18:18 19:5

standards 33:12

standing 18:17

start 5:7 16:18

started 11:13

state 4:6 5:24

state's 26:24 27:3 50:1

state-appointed 48:8

stated 33:22

states 42:3 53:8

Stateville 25:14,19

stating 68:14

station- 77:23,24

stationary 79:13

stay 37:13 57:4 59:17,19

stayed 6:1

stays 73:7

step 29:17

stolen 68:4,9

strengthens 52:13

stress 57:6 59:23

strike 24:23 75:5,10

structures 30:3

stuff 15:13 68:11 69:14 74:21 79:6

suck 74:11

Summary 73:10

superintendent 20:4

EXHIBIT 1

**supervisor** 68:13

**support** 64:1

**suppose** 13:22

**supposed** 6:6 15:10,15,17,18 32:16

**surrounded** 22:3

**swapping** 71:10

**swelling** 11:24

**switch** 11:21

**switched** 11:17

**sworn** 4:18,21

**system** 53:9

_____

**T**

**table** 75:16

**taking** 69:8 74:21

**talk** 15:9 23:4 45:13 53:14 54:4 69:1

**talked** 20:15,16,18 21:8 37:20 77:3

**talking** 4:9 9:23 69:2 76:9 79:12

**tape** 56:17

**tapes** 67:3 69:7

**tear** 11:12

**teeth** 52:13

**telecommunication** 6:11

**telling** 44:24 60:24

**ten** 22:17 25:21 68:5 84:18

**terms** 15:1 16:15

**testified** 4:21 45:13 80:14

**testify** 20:14 49:10

**testimony** 20:13 21:18 46:24 50:9

**Texas** 5:24 80:23

**theft** 9:16 10:12

**thereof** 21:16 34:24

**thicken** 62:1

**thing** 22:19 39:15 43:10 59:16 69:16 79:17,19 82:5

**things** 11:10 20:6,20 21:8 36:15 37:9 39:24 41:12 59:14 69:8 70:3 74:19 82:3

**Thomas** 4:4

**thought** 43:13,17 71:9,11,12

**threw** 44:7,10

**throw** 59:22

**tier** 33:23 64:16 68:23 83:7 84:15 85:4,12

**tiers** 10:21,24

**till** 84:21

**time** 12:20 15:3 20:2 21:6 43:7,11 48:8,9 52:6 53:10,21 55:17 56:15, 24 57:8,11,20 59:15 62:9,12 65:5, 20 66:18 70:23

**timeline** 25:16

**timely** 65:3,19

**times** 9:6,10 24:2 82:6,20 83:8,20 84:13,17,18

**tired** 12:2

**toilet** 16:2,3,5 18:11 19:1,2 30:2 34:18 36:1 37:10 62:20 81:21

**toileting** 17:13 19:16 21:7 33:23 37:23 62:18,19 63:20,23 80:1 81:18

**toilets** 20:17,20 21:21 38:3,6

**told** 20:4 23:2,5 53:11 56:18 62:7 63:6 67:4

**Tom** 12:22

**toothpaste** 52:3,12

**topic** 14:4,7

**total** 82:21

**totally** 30:4 54:24 84:8

**transferred** 25:12

**tray** 50:24

**tricked** 69:10

**trouble** 72:3 80:1

**tub** 18:17 34:21 36:14 63:12,16,18

**tubing** 18:24

**tunnel** 24:12,19 48:6 53:14

**turn** 17:3 36:15 38:8,23 39:8 41:21 46:14 47:3,17 50:16 51:7 52:1 56:7 64:6 66:6,9

**turned** 46:16 79:2

**Turning** 33:4

**twelve** 30:11 57:13,22 82:20

**type** 33:12

_____

**U**

**Uber** 6:9,18 8:10

**Um-hmm** 30:15 51:1 60:11 64:11

**un-** 56:24

**uncomfortable** 11:20

**understand** 5:1,4 7:11 9:21 23:9 41:16 50:8

**understanding** 77:21

**unhappy** 38:14

**units** 79:17

**unknown** 67:1

**unofficial** 16:8

**unthicken** 62:2

**unusable** 42:12,13,16

**usable** 42:9,21

_____

**V**

**versus** 63:15

**view** 45:7

**visit** 30:13

_____

**W**

**wait** 60:19 69:11 82:17 84:19,20

**waited** 82:2

**waive** 85:19

**walk** 24:15,16,19 63:24

**walker** 36:13 63:4,7,10,11,12,13, 17 78:19 79:4,24

**walkers** 11:8 76:1 77:9,12,15 78:18

**walking** 12:6,15 22:19 33:20 62:20 78:10

**walks** 12:10,12 37:19 38:1 48:7

**wall** 16:1,4,24 17:22 62:23

**wanted** 67:2

**wash** 17:4 18:17,18

**EXHIBIT 1**

**washing** 17:5 18:19

**washroom** 58:12

**wasted** 20:2

**water** 75:15

**wear** 11:12,18 36:11 59:24 63:2

**wearing** 11:13 63:15

**week** 83:14

**weeks** 25:20

**weight** 57:5,7 59:15 60:1 62:2,4,9

**wheelchair** 24:13 25:5 37:19 48:6
  50:5,7 55:19

**wheelchair's** 12:1

**wheelchairs** 11:7 38:20

**wheels** 19:5 46:5 79:15 84:3

**white** 67:4

**window** 10:14

**wing** 20:17 49:21 67:1 81:24 83:17

**wore** 61:11,17

**work** 6:7,17 42:4 43:23 69:12 71:6

**worked** 6:11,14

**working** 44:5 85:4

**worry** 74:18,19

**worser** 15:11

**wounds** 7:18 15:12

**write** 40:17 41:14

**writing** 65:6,21

**written** 39:16 40:5,12 45:18,20
  49:6

**wrote** 34:2 42:12 45:21 71:20

---

                          **Y**

---

**year** 7:10 62:13

**years** 6:2 7:24 8:2 52:4 60:17

**yoga** 22:19

---

                          **Z**

---

**Zach** 4:3

EXHIBIT 1